IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
WESTERN DIVISION
No. 23-cv-00808

| | |
|---|---|
| CHRISTOPHER WALLING, Individually and on behalf of All Others Similarly Situated, | ) ) COMPLAINT FOR VIOLATIONS OF ) FEDERAL SECURITIES LAWS |
| Plaintiff, | ) |
| | ) 15 U.S.C. §§78j(b), 78t(a) |
| vs. | ) 17 C.F.R. §240.10b-5 |
| | ) |
| GENERAC HOLDINGS, INC., | ) CLASS ACTION |
| AARON P. JAGFELD, and | ) |
| YORK A. RAGEN | ) DEMAND FOR JURY TRIAL |
| Defendants. | ) |
| | ) |

Lead Plaintiff Christopher Walling, by and through his undersigned attorneys, individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included a review of Defendants' public documents, conference calls, announcements, and United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Generac Holdings, Inc. ("Generac" or the "Company"); analysts' reports and advisories about the Company; and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons who purchased or otherwise acquired GNRC stock between May 3, 2023 and August 3, 2023, inclusive (the "Class Period"), against Generac and certain of its officers and/or directors for violations of the Securities

1

Exchange Act of 1934 (the "1934 Act"). As set forth in detail below, Defendants violated Section 10(b) of the 1934 Act by failing to disclose pertinent information relevant to the Company, or, alternatively providing information about the Company which was misleading or deceptive.

2. Generac designs, engineers and markets standby power generators. It produces generators for both industry and for home consumers. It also produces other products for industrial and personal use, such as heaters and pressure washers.

3. At the beginning of the Class Period, on May 3, 2023, the Company held its quarterly earnings call for investors. During the call, President and CEO Aaron P. Jagfeld ("Jagfeld") noted the Company's sales and earnings declined year-over-year and quarter-over-quarter.

4. Nevertheless, Jagfeld gave investors an optimistic outlook, stating an expectation that "gross sales from residential energy technology products and services to deliver between $300 million and $350 million for the full year 2023." He further indicated an expectation for improvement in the second half of 2023.

5. Later in the same earnings call, York A. Ragen ("Ragen"), Generac's CFO and CAO, stated, "demand for our home standby products tends to be driven more by power outages than overall macroeconomic conditions," giving investors the impression that Generac's sales should remain steady in spite of worsening economic conditions in the U.S. and abroad.

6. Jagfeld later reiterated that macroeconomic factors are a secondary factor for the Company's sales and growth, stating, "I think the biggest thing over my time here, almost 3 decades at the company, is that power outages trump the economy every day of the week."

7. On August 2, 2023, the Company held its Q2 2023 earnings call. During that call, Jagfeld revealed lackluster quarterly results, including a $1 billion sales decrease year-over-year and that residential sales decreased 44%.

8. When explaining that decline, Jagfeld contradicted his May statements discounting macroeconomic trends. He said, "[the Company] underperformed our expectations as a result of the shift in consumer spending patterns," thus admitting the importance of inflation on consumer spending. Consequently, Jagfeld advised investors, "[t]his weaker than previously expected demand environment is expected to persist in the second half of the year, also contributing to our lower outlooked for residential product sales."

9. Generac's share price dropped swiftly in the day after the earnings call. On August 1, 2023 shares closed to $153.38; by the close on August 3, 2023 shares plummeted to $110.77.

## JURISDICTION AND VENUE

10. Jurisdiction is conferred by Section 27 of the 1934 Act, 15 U.S.C. §78aa. The claims asserted herein arise under Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

11. Generac's headquarters is located at S45 W29290 Highway 59, Waukesha, WI.

12. Venue is proper in this District pursuant to Section 27 of the 1934 Act. The violations of law complained of herein occurred in part in this District, including the dissemination of materially false and misleading statements complained of herein into this District.

13. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities

markets. The Company trades in an efficient market on the New York Stock Exchange under the ticker symbol GNRC.

## PARTIES

14. Plaintiff Christopher Walling purchased GNRC stock as described in the Certification submitted in support of the motion for appointment as lead plaintiff. Plaintiff suffered damages in connection with his purchase of GNRC stock. Plaintiff's Certification is incorporated herein by reference.

15. Defendant Generac Holdings, Inc. is incorporated in Delaware and has its headquarters in this District. Shares of the Company's stock trade on the NYSEMKT under the ticker symbol "GNRC."

16. Defendant Aaron P. Jagfeld was at all relevant times President and CEO of GNRC.

17. Defendant York A. Ragen is and at all relevant times was Executive Vice President and Chief Financial Officer and Chief Accounting Officer of the Company.

18. Defendants Jagfeld and Ragen (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of AAP's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive

4

representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF CONDUCT

19. Defendants are liable for: (a) making false or misleading statements; or (b) failing to disclose adverse facts known to them about Generac. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of GNRC stock was a success, as it: (a) deceived the investing public regarding GNRC's prospects and business; (b) artificially inflated the price of GNRC common stock; and (c) caused Plaintiff and other members of the Class, as defined below, to purchase GNRC stock at inflated prices and suffer economic loss when the revelations set forth herein reached the market.

20. Defendants' false statements and/or material omissions related to the Company's ability to retain and grow its residential sales sector in the face of difficult macroeconomic trends, such as inflation. Defendants underplayed the impact of inflation on consumer generator sales, going so far as to say that it is "trumped" by other factors. Consequently, Defendants provided investors with a skewed outlook for 2023, asserting that the Company would recover sales by the second half of 2023, in spite of macroeconomic factors which disfavored consumer spending.

21. Defendants' statements, however, were materially at odds with existing facts known by Defendants at the time they made the statements, in particular that macroeconomic condition caused reduced consumer spending on non-essential items and that, absent a reduction in inflation, consumers were likely to remain unlikely to purchase big-ticket, discretionary items.

22. In light of the above facts, Defendants knew that the public documents and statements issued or disseminated in the name of the Company about the strategic price

reductions/surgical price reductions and the effects of the macroeconomic environment were materially false and misleading. As such, Defendants acted with scienter.

## CLASS ACTION ALLEGATIONS

23. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired GNRC stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

24. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. GNRC trades on the NYSE and has more than 61 million shares outstanding, owned by hundreds, if not thousands, of persons.

25. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to members of the Class which predominate over questions that may affect individual Class members include:

(a) whether Defendants violated the 1934 Act;

(b) whether Defendants omitted and/or misrepresented material facts;

(c) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) whether the price of GNRC stock was artificially inflated; and

(f) the extent of damages sustained by Class members and the appropriate measure of damages.

26. Plaintiff's claims are typical of those of the Class because Plaintiff and the other Class members sustained damages from Defendants' wrongful conduct.

27. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

28. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

**ISSUED DURING THE CLASS PERIOD**

29. At the beginning of the class period, on May 3, 2023 before market hours, the Company issued a press release concerning its first quarter earnings and outlook for the remainder of the year. In pertinent part, the press release stated:

> WAUKESHA, WISCONSIN (May 3, 2023) – Generac Holdings Inc. (NYSE: GNRC) ("Generac" or the "Company"), a leading global designer and manufacturer of energy technology solutions and other power products, today reported financial results for its first quarter ended March 31, 2023 and provided an update on its outlook for the full year 2023.
>
> . . .
>
> "As expected, first quarter sales were down year-over-year due to a challenging prior year comparison related to the significant excess backlog for home standby products as we entered 2022," said Aaron Jagdfeld, President and Chief Executive Officer. "In addition, residential product sales in the current year quarter were impacted by elevated levels of field inventory for home standby generators and a decline in clean energy products as we continue to expand our distribution network. However, power outage activity in the quarter was well above the long-term average, helping drive significant year-over-year growth for home standby in-home consultations and a meaningful reduction in field inventory levels for these products. Our global C&I product sales were at all-time highs in the quarter and

exceeded our expectations with strength across all channels domestically and most regions internationally. As a result of these factors, we are maintaining our full-year 2023 net sales and adjusted EBITDA margin guidance."

. . .

Due to ongoing strength in leading indicators of demand for home standby generators and significant backlog for C&I products, the Company is maintaining its full-year 2023 net sales guidance. Consistent with the prior outlook, shipments of residential products are still expected to remain soft during the second quarter as home standby field inventory levels continue to normalize, with a return to year-over-year sales growth in the second half of the year partially offsetting the expected first half decline. In addition, our outlook for C&I product sales to grow at a mid to high-single digit rate during the year remains unchanged. Accordingly, the Company continues to expect full-year net sales to decline between -6 to -10% as compared to the prior year, which includes approximately 1 to 2% of net favorable impact from acquisitions and foreign currency.

Additionally, the Company continues to expect net income margin, before deducting for non-controlling interests, to be approximately 7.5 to 8.5% for the full-year 2023. The corresponding adjusted EBITDA margin is still expected to be approximately 17.0 to 18.0% and disproportionately weighted towards the second half of the year.

Operating and free cash flow generation is expected to return to strong levels for the full year, with conversion of adjusted net income to free cash flow expected to be well over 100%.

30.     Also on May 3, 2023, after market hours, the Company held its quarterly earnings call for investors. During the call, Jagfeld described the Company's sales and earnings for the first quarter of 2023. Jagfeld stated year-over-year sales decreased 22% and sales for the quarter declined 24%."

31.     Despite those challenges, Jagfeld gave investors an optimistic outlook, stating "[w]e continue to anticipate a return to year-over-year sales growth" and expected "gross sales from residential energy technology products and services to deliver between $300 million and $350 million for the full year 2023."

32.     Jagfeld tried to assuage investors by suggesting Generac's sales had reached a new threshold. He said, "[f]or historical perspective first quarter homes consultations were more then

8

4x higher than the comparable period in 2019, supporting our belief that the home standby generator category has reached a new and higher baseline of demand." Jagfeld later claimed, "the robust level of power outage activity and resulting strength in home consultations for home standby generators so far here in 2023 **provides incremental support for our expectations to return to year-over-year sales growth in the residential product category in the second half of the year**," thus discounting other factors which may influence generator sales aside for outages.

33. During the same earnings call, Ragen, Generac's CFO and CAO, stated, **"demand for our home standby products tends to be driven more by power outages than overall macroeconomic conditions,"** giving investors the impression that Generac's sales should remain steady in spite of worsening economic conditions in the U.S. and abroad.

34. Analysts probed Jagfelds and Ragen's confidence in Generac's rebound. During the question-and-answer portion of the May earnings call, Michael Patric Halloran, an analyst for Robert W. Baird, commented "[I w]ould love to understand by the confidence level is so high that you can maintain. … [J]ust kind of laying out why you think things are going to be, from an underlying perspective, pretty stable moving into the back half would be great."

35. Jagfeld responded to Halloran's question by explaining:

> I think just talking to the trends and what gives us confidence in the second half of the year. So the way we think about it, those sales leads, which are an important leading indicator in the category for us, they mature over a period of 90 to 120 days, call it, from when you do the consultation to when the product actually gets installed. So we think terms of near-term visibility, right, next quarter, next 1.5 quarters, perhaps, we think we have a pretty good view on the kind of end market demand, as it were. That, coupled with the fact we're underserving the market now, right? ….
>
> So I would just say that Q1, artificially low relative to what home standby shipments could have been had we been matching kind of the shipping pace with the demand pace, right? So we were out of step with that because of the field inventory challenges that we've talked much about here. So you put those together, and we're pacing to have that abate as we enter the second half of the year. We

think that, that's something's going to improve.  As we said, we're going to get back to more normal levels there.  So we return to more normal levels there. …

But – so if you take that out of it, though, and we look to the future – and then kind of speaking more broadly, I think to our experience in the category when you have maybe a softening economic backdrop, I can point to the last kind of pullback economically in 2008, 2009, when you look at housing in particular … the slowdown in the economy right that we're – that people are concerned about or experiencing is not necessarily the same type of experience that happened in '09, '09, where it was directly related to housing prices, home values, mortgage obviously … And if there was ever a time when you think that we get pegged at this category, really pegged bit-ticket discretionary item, right, tied to residential investment.  You would have thought that would have been the worst environment ever for this category back in '08, '09.  We actually gew our residential part of the business back then. …

**And I think the biggest thing over my time here, almost 3 decades at the company, is that power outages trump the economy every day of the week.**

36. Later, Christopher D. Glynn, an Oppenheimer analyst, engaged in the following exchange in which Jagfeld again discounted the impact of macroeconomic factors on generator sales.  Rather, Jagdfelt pointed to potential sales as the important measure to evaluate:

<Glynn> Wanted to ask about the – you mentioned home consultations for HSB were up significantly in almost all states.  So I wanted to give into that a little bit.  And then also, clarify the expectation for residential growth in the second half.  Does that explicitly include growth in 3Q?  Or if not, are you biased in that respect to see at least a bit of topline positive from resi[dential] in 3Q?.

<Jagfeld>: Yes, **we are seeing a return to growth starting around the third quarter.  So that is the expectation and the way we got the guidance around residential.** More specifically to the commentary about home consultations being very broad-based, right, almost all states.  I think what was really encouraging again in this, this is what I think is different from kind of pre-pandemic to today.  As you may recall, we mentioned that just consultations in general up dramatically from that pre-pandemic period, almost – really more than 4x off that base.  **And I think when you step back and you look at that kind of pre-pandemic to today, it is the broad-based nature of that growth that's really encouraging for us."**

## THE TRUTH EMERGES

37. On August 2, 2023, the Company held its Q2 2023 earnings call.  During that call, Jagfeld revealed lackluster quarterly results: "[y]ear-over-year, overall net sales decreased 23%

10

to $1 billion and quarter sales declined 26% during the quarter. Residential sales products decreased 44% …"

38.  Jagfeld contradicted his May statements which suggested generator sales were impervious to macroeconomic trends. He said, "residential products were lower than expect as a result of a softer consumer spending environment that impacted shipments of home standby generators..." He continued to blame poor residential sales as the reason for the quarterly decline, since "[a]activations were also below our expectations for the quarter, primarily due to the weaker consumer spending environment for home improvement … [The Company] underperformed our expectations as a result of the shift in consumer spending patterns."

39.  Not only did Jagfeld attribute the poor quarterly results on weak consumer spending, but he also indicated the diminished consumer spending would affect Generac's sales for the remainder of 2023, as "with close rates and activations lower than expected in the quarter, the field inventory normalization process is now expected to extend further into the second quarter." Thus, "[t]his weaker than previously expected demand environment is expected to persist in the second half of the year, also contributing to our lower outlooked for residential product sales."

40.  Ragen also admitted that "lower shipments of home standby generators, power cell energy storage system and chore products drove this decline in residential product sales." He further explained the residential sector is "not going to improve as much as we thought relative to 3 months ago because of the softer consumer that we're seeing."

41.  During the question-and-answer section of the call, Jeffrey David Hammon of KeyBanc Capital Markets asked about the poor quarterly results:

> <Hammon>: Just back on this close rate dynamic. I'm wondering if you're getting feedback from your dealer network on kind of why the close rates are lower? Is it

11

financing costs or the higher cost? Because I know you had been contemplating lead time or close rates getting better as lead times shorten. So that seems to be the big surprise and just looking for more feedback color.

<Jagfeld>: This is a surprise to us as well. … I think you're hearing commentary, but we're not all seeing maybe the consumer step up to the same level that we all expected. And that, I think is indicative of perhaps just the work that the Federal Reserve is doing here to tamp down inflation with higher rates. I think it's starting to bite in some of these areas, in particular on these bigger type of purchases …"

42. Generac shares plummeted after the earnings call. On August 1, 2023 shares closed to $153.38; by the close on August 3, 2023 shares plummeted to $110.77 – a 27.8% drop.

**LOSS CAUSATION AND ECONOMIC LOSS**

43. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of GNRC stock and operated as a fraud or deceit on Class Period purchasers of GRNC stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market on August 2, 2023, the price of GNRC stock fell precipitously. As a result of their purchases of GRNC stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws when the truth about GNRC was revealed through the disclosures specified herein, which removed the artificial inflation from the price of GNRC common stock.

44. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of GNRC's business and prospects. Defendants' false and misleading statements had the intended effect and caused GNRC stock to trade at artificially inflated levels throughout the Class Period.

45. As a direct result of the disclosure identified herein, the price of GNRC stock fell precipitously, causing real economic loss to investors who had purchased GNRC stock at artificially inflated prices during the Class Period.

46. The price declines on August 2 and August 3, 2023 were a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market through the August 2023 earnings call. The timing and magnitude of the price declines in GNRC stock negate any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of GNRC stock and the subsequent significant decline in the value of GNRC stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## PRESUMPTION OF RELIANCE

47. At all relevant times, the market for GNRC stock was an efficient market for the following reasons, among others:

(a) GNRC stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) as a regulated issuer, GNRC filed periodic public reports with the SEC;

(c) GNRC regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) GNRC was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

48. As a result of the foregoing, the market for GNRC stock promptly digested current information regarding GNRC from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of GNRC stock during the Class Period suffered similar injury through their purchase of GNRC stock at artificially inflated prices and a presumption of reliance applies under the fraud-on-the-market doctrine.

49. A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material Class Period omissions regarding, among other things, that the strategic pricing initiative was likely to fail due to the industry's imperviousness to price, that requirement is satisfied here.

## NO SAFE HARBOR

50. The "Safe Harbor" warnings accompanying GNRC's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. Defendants are also liable for any false and misleading FLS pleaded because, at the time

14

each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of GNRC who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading. Finally, most of the purported Safe Harbor warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## COUNT I

**Defendants Violated Section 10(b) and SEC Rule 10b-5(a)**

51. Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

52. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53. Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and other Class members in connection with their purchases of GNRC stock during the Class Period.

54. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class members have suffered damages in connection with their respective purchases and sales of GNRC stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for GNRC stock and experienced loses when the artificial inflation was released from GNRC stock as a result of the revelations and stock price decline detailed herein. Plaintiff and the other Class members would not have purchased GNRC stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

55. By virtue of the foregoing, GNRC and the Individual Defendants have each violated Section 10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### Jagfeld and Ragen Violated Section 20(a) of the 1934 Act

56. Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

57. The Individual Defendants acted as controlling persons of GNRC within the meaning of Section 20(a) of the 1934 Act. By reason of their controlling positions with the Company, and their ownership of GNRC common stock, the Individual Defendants had the power and authority to cause GNRC to engage in the wrongful conduct complained of herein. GNRC controlled the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Declaring that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon; and

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 21, 2023

*/s/ Andrew G. Frank*
Andrew G. Frank SBN 1046021
Mallery sc
731 North Jackson Street, Suite 900
Milwaukee, Wisconsin 53202
Tel: 414.271.2424
Fax: 414.271.8678
Email: afrank@mallerysc.com

*Liaison Counsel for Plaintiff*

-and-

Adam M. Apton
Levi & Korsinsky, LLP
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
(*pro hac vice to be submitted*)

*Counsel for Plaintiff*