IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | | |
|---|---|---|
| CHRISTOPHER WALLING, Individually and on behalf of All Others Similarly Situated, | ) ) ) | Case No. 2:24-cv-00240-PP |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) | |
| GENERAC HOLDINGS, INC., AARON P. JAGDFELD, and YORK A. RAGEN, | ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................... 1

II.     SUMMARY OF THE FACTS ................................................................................ 2

    A.  Defendants Lied about Demand and Inventory at a Critical Juncture in Generac's Post-Pandemic Recovery. ................................................................................................ 2

    B.  Contrary to Their Public Statements, Defendants Were Not Lowering Inventory Levels and Were Not Tracking for a Return to Normal Sales. .................................... 3

    C.  Deteriorating Macroeconomic Conditions Further Prevented Generac from Clearing Excess Inventory. ................................................................................................... 4

    D.  Generac's Stock Plummeted 25% Overnight After Defendants Revealed the Truth about Their Ongoing Inventory Troubles. .................................................................. 5

III.    RELEVANT LEGAL STANDARD ....................................................................... 6

IV.     ARGUMENT ......................................................................................................... 6

    A.  The Complaint Alleges Falsity with Particularity. ....................................................... 6

        1.  Plaintiff Adequately Pleads False and Misleading Statements. ............................ 7

        2.  Defendants' Statements Are Not Mere Matters of Puffery or Opinion. ............ 12

        3.  Defendants' Statements Are Not Protected Under the Safe Harbor. ................. 16

    B.  The Complaint Alleges a Strong Inference of Scienter. ............................................. 20

        1.  Defendants Knew or Had Access to Adverse Information. ............................... 20

        2.  Motive Allegations Bolster Scienter Inference. ................................................ 28

    C.  The Complaint Adequately Pleads Control Person Liability. ...................................... 30

V.      CONCLUSION .................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008) ........................................................................................ 20

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ........................................................................ 10

*Allison v. Oak St. Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ........................................... 15, 25, 28, 30

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. June 2, 2020) ............................................................. 16

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F.Supp.3d 737 (S.D.N.Y. 2018) ......................................................................... 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................................... 6

*Asher v. Baxter Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004) ......................................................................... 17, 18, 19

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F.Supp.2d 1142 (S.D. Cal. 2008) ....................................................................... 12

*Azar v. Grubhub, Inc.*,
2021 WL 4077327 (N.D. Ill. Sept. 7, 2021) ................................................................ 7

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ..................................................................................................... 6

*In re Boeing Co. Aircraft Sec. Litig.*,
2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ............................................................ 16

*In re BP p.l.c. Sec. Litig.*,
843 F.Supp.2d 712 (S.D. Tex. 2012) ........................................................................ 22

*In re Brightpoint, Inc. Sec. Litig.*,
2001 WL 395752 (S.D. Ind. Mar. 29, 2001) ............................................................. 30

*Carpenters Pension Tr. Fund for N. CA v. Allstate Corp.*,
2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ............................................................ 22

*Chandler v. Ulta Beauty, Inc.*,
2022 WL 952441 (N.D. Ill. Mar. 30, 2022) .............................................................. 24

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ........................................................... 25

*City of Lakeland Emps. Penson Plan v. Baxter Int'l,*
2012 WL 607578 (N.D. Ill. Jan. 23, 2012) ................................................................. 7, 26

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.,*
711 F.3d 754 (7th Cir. 2013) ...................................................................................... 10

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ............................................................. 16

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.,*
2013 WL 566805 (N.D. Ill. Feb. 13, 2013) .................................................... 10, 28, 29

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.,*
8 F.4th 592 (7th Cir. 2021) ......................................................................................... 14

*Desai v. Gen. Growth Props., Inc.*,
654 F.Supp.2d 836 (N.D. Ill. 2009) ...................................................................... 10, 21

*Flynn v. Exelon Corp.*,
2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) .............................................................. 21

*Friedman v. Rayovac Corp.*,
295 F.Supp.2d 957 (W.D. Wis. 2003) ......................................................................... 25

*Fryman v. Atlas Financial Holdings, Inc.*,
462 F.Supp.3d 888 (N.D. Ill. 2020) ............................................................................ 24

*Grae v. Corr. Corp. of Am.,*
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017)........................................................... 26

*Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp,*
2022 WL 1642221 (N.D. Ill. May 24, 2022)................................................................ 30

*Hedick v. Kraft Heinz Co.*,
2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ................................................... 15, 17, 18

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ...................................................................................... 10

*Holwill v. AbbVie Inc.*,
2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ...................................................... 7, 27, 29

*Iles v. Swank*,
2006 WL 1806365 (N.D. Ill. June 28, 2006) .............................................................. 19

*Jones v. Corus Bankshares, Inc.*,
701 F.Supp.2d 1014 (N.D. Ill. 2010) .................................................................. *passim*

*Lindelow v. Hill,*
2001 U.S. WL 830956 (N.D. Ill. July 20, 2001)................................................... *passim*

*Luellen v. City of E. Chi.*,
350 F.3d 604 (7th Cir. 2003) ...................................................................................... 30

*Macovski v. Groupon, Inc.*,
2021 WL 1676275 (N.D. Ill. Apr. 28, 2021) ........................................................................ 30

*Macovski v. Groupon, Inc.*,
553 F.Supp.3d 460 (N.D. Ill. 2021) ............................................................................... 12, 13

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ..................................................................................... *passim*

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006) ............................................................................................ 12

*Marks v. CDW Computer Ctrs., Inc.*,
122 F.3d 363 (7th Cir. 1997) ............................................................................................ 12

*Martin v. Quartermain*,
732 F.App'x 37 (2d Cir. 2018) ......................................................................................... 14

*Menzies v. Seyfarth Shaw LLP*,
943 F.3d 328 (7th Cir. 2019) .............................................................................................. 7

*Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*,
2012 WL 4049953 (S.D.N.Y. Sept. 14, 2012) .................................................................. 22

*In re MGM Mirage Sec. Litig.*,
2013 WL 5435832 (D. Nev. Sept. 26, 2013) .................................................................... 14

*In re NeoPharm, Inc. Sec. Litig.*,
2003 WL 262369 (N.D. Ill. Feb. 7, 2003) .......................................................................... 9

*Next Level Sys. Sec. Litig.*,
1999 WL 387446 (N.D. Ill. Mar. 31, 1999)........................................................................ 9

*Norfolk Cty. Ret. Sys. v. Ustian*,
2009 WL 2386156 (N.D. Ill. July 28, 2009)................................................................. 20, 28

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)................................................................................................. 6, 15, 16

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
895 F.3d 933 (7th Cir. 2018) ............................................................................................ 21

*Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*,
690 F.Supp.3d 862 (N.D. Ill. 2023) .................................................................................. 17

*Pierrelouis v. Gogo, Inc.*,
2021 WL 1608342 (N.D. Ill. Apr. 26, 2021) .................................................................... 19

*Pierrelouis v. Gogo, Inc.*,
414 F.Supp.3d 1164 (N.D. Ill. 2019) ................................................................................ 24

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*,
778 F.Supp.2d 858 (N.D. Ill. 2011) ................................................................ 7, 9, 27, 30

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
679 F.3d 952 (7th Cir.2012) .................................................................................. 29

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
2018 WL 844420 (N.D. Ill. Feb. 12, 2018) ............................................. 14, 18, 20, 25

*Pugh v. Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) .................................................................................. 6

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ................................................................................ 11

*In re QuantumScape Sec. Class Action Litig.*,
580 F.Supp.3d 714 (N.D. Cal. 2022) ...................................................................... 15

*Robb v. Fitbit Inc*,
2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ............................................................ 26

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) .................................................... *passim*

*Rubinstein v. Gonzalez*,
241 F.Supp.3d 841 (N.D. Ill. 2017) ......................................................................... 6

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ......................................................... 16

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
2024 WL 1898512 (S.D.N.Y. May 1, 2024) ........................................................... 14

*In re SCANA Corp. Sec. Litig.,*
2019 WL 1427443 (D.S.C. Mar. 29, 2019) ............................................................. 16

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) .................................................................................... 11

*In re Sears, Roebuck & Co. Sec. Litig.*,
291 F.Supp.2d 722 (N.D. Ill. 2003) ....................................................................... 21

*SEC v. Ustian*,
229 F.Supp.3d 739 (N.D. Ill. 2017) .................................................................. 12, 13

*Selbst v. McDonald's Corp.*,
2005 WL 2319936 (N.D. Ill. Sept. 21, 2005) ..................................................... 16, 19

*Sequel Cap., LLC v. Rothman*,
2003 WL 22757758 (N.D. Ill. Nov. 20, 2003) ......................................................... 9

*Silverman v. Motorola, Inc.,*
    2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ........................................................................... 21

*In re Sinclair Broad. Grp., Inc. Sec. Litig.,*
    2020 WL 571724 (D. Md. Feb. 4, 2020) ................................................................................... 11

*Sinnathurai v. Novavax, Inc.,*
    645 F.Supp.3d 495 (D. Md. 2022) ............................................................................................ 26

*Slayton v. Am. Express Co.,*
    604 F.3d 758 (2d Cir. 2010) ............................................................................................... 17, 19

*Stavros v. Exelon Corp.,*
    266 F.Supp.2d 833 (N.D. Ill. 2003) ......................................................................................... 18

*Stransky v. Cummins Engine Co., Inc.,*
    51 F.3d 1329 (7th Cir. 1995) ...................................................................................... 7, 10, 17

*Takara Tr. v. Molex Inc.,*
    429 F.Supp.2d 960 (N.D. Ill. 2006) ................................................................................... 16, 30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ........................................................................................................... 20, 30

*Van Noppen v. InnerWorkings, Inc.,*
    136 F.Supp.3d 922 (N.D. Ill. 2015) ......................................................................................... 19

*Zelman v. JDS Uniphase Corp.,*
    376 F.Supp.2d 956 (N.D. Cal. 2005) ....................................................................................... 11

## I.    INTRODUCTION

Generac Holdings, Inc. ("Generac") enjoyed record-breaking earnings for a brief period as homeowners bought home standby generators ("HSBs") in droves at the outset of the Covid-19 pandemic. To keep up with demand, Generac opened new manufacturing facilities and recruited new dealers to sell as many generators as it could. Demand ultimately subsided as the pandemic waned, leaving Generac with a glut of excess inventory throughout its entire distribution chain, *i.e.*, factories, warehouses, dealers, retailers, and wholesalers. Generac attempted to work through the excess inventory by offering promotions and other customer incentives but deteriorating macroeconomic conditions impeded these efforts and left the company with virtually no hope of meeting its targets for the year. Instead of disclosing these realities to the market, Defendants kept them hidden and instead offered investors false assurances about the progress they had made during the first quarter and would continue to make throughout the year. When the truth ultimately emerged, Generac's stock price plummeted 25% overnight causing massive losses for investors.

Defendants attempt to sidestep liability for their actions by relying on what they would have this Court believe to be pleading infirmities under the PSLRA. But Defendants overlook the realities of being at the pleading stage and what that means, namely Plaintiff's allegations under the law are to be accepted as true with all favorable inferences drawn in his favor. Thus, when Defendants told investors that Generac was rounding the corner in terms of inventory problems and was on track to meet its 2023 targets, their statements were materially misleading because:

- Generac set its 2023 targets without accounting for the inventory it already had on hand or knowing how many generators its factories were manufacturing;
- Production reports revealed that Generac had been, and was continuing to, produce generators at a rate consistent with incoming orders, meaning existing inventory levels could not decrease absent extraordinary circumstances;

- Generac's excess inventory (at its factories and in its distribution chain) was larger than anticipated when setting the 2023 targets and was not decreasing at the rate Defendants needed to hit them, *i.e.*, normal levels and sales growth; and

- Deteriorating macroeconomic conditions were already impeding sales which, in turn, further prevented Generac from lowering its inventory levels.

Defendants knew their statements were material and expected investors and analysts to rely on them when making investment decisions. Defendants cannot now disclaim those statements as unimportant or inactionable. Plaintiff's claims are not based on immaterial statements (puffery) or failed predictions of future events. Far from it, Defendants' misleading statements related to Generac's most critical residential product line, HSBs. These claims arise because Defendants made unsupported and overly optimistic statements about Generac's HSB inventory and sales while concealing then-existing negative trends and data, which led to Generac's stock price being so inflated that it declined by roughly a quarter (or 25%) in a single trading day when the truth was revealed. This market reaction shows how material Defendants' misstatements were to investors at the time. Accordingly, Defendants' motion should be denied in its entirety.

## II. SUMMARY OF THE FACTS

### A. Defendants Lied about Demand and Inventory at a Critical Juncture in Generac's Post-Pandemic Recovery.

Generac was one of the few companies to benefit from the Covid-19 pandemic. As more regions enacted stay-at-home orders, Generac's business boomed as homeowners redirected their disposable income towards home improvements; in this case, installing HSBs. To meet the demand, Generac opened factories to increase production and recruited dealers to increase sales. ¶¶26-30. As the pandemic waned, however, demand decreased and left Generac with a glut of inventory and no one to sell it to. ¶¶31-33. The market was heavily focused on this issue, and for their part, Defendants did their best to reassure investors it was under control. For example, before the Class Period, Jagdfeld (Generac's CEO) spoke at length about HSB inventory, how long it

would take to clear, and when the market could expect a return to normal sales growth. ¶¶29, 31.

The market remained focused on Generac's inventory levels into 2023. *See* ¶¶35-37. On May 3, 2023, Jagdfeld and Ragen (Generac's CFO) touted the progress they purportedly made during the prior quarter (*i.e.*, 1Q23) and affirmed their sales outlook for the year. ¶¶3, 34, 60-64. When discussing Generac's 1Q23 results, Jagdfeld told inventors there had been "a meaningful reduction in field inventory levels." ¶60; *see also* ¶¶62, 64. When directly asked by analysts about Generac's HSB sales in the face of potential negative macroeconomic conditions, Jagdfeld assured them that Generac was "pacing to have that abate as we enter the second half of the year … As we said, we're going to get back to more normal levels there." ¶64. And when discussing the timeline for inventory normalization and sales growth, Defendants represented they were tracking "a return to year-over-year sales growth in the second half of the year." ¶60; *see also* ¶¶62-64 (Jagdfeld: "yes, we are seeing a return to growth starting in the third quarter").

**B.**     **Contrary to Their Public Statements, Defendants Were Not Lowering Inventory Levels and Were Not Tracking for a Return to Normal Sales.**

Defendants' May 3 statements concerning 1Q23 progress and the 2023 outlook were materially misleading. Defendants set the outlook in November 2022 based on incorrect and/or incomplete information due to the lack adequate internal reporting on production rates and supply levels. As a result, Generac's timeline for inventory normalization was not based on reliable and/or accurate information and, contrary to what they stated publicly, Generac was continuing to experience over-production and inventory saturation. ¶¶41-44, 46-47 (former employees confirming lack of internal reporting and over-production in 4Q22 and 1H23). Consequently, when Defendants reaffirmed the 2023 outlook on May 3, they did so knowingly, or at minimum, with reckless disregard of the substantial risk that their statements were misleading investors.

CW1—Generac's former Operations Financial Analyst from September 2022 to March 2023—explained that Generac did not have production reports prior to January or February 2023. Production reports, according to CW1, would have specified the number of generators that Generac needed to produce at each plant. ¶41. CW1 was tasked with developing these reports in November 2022 to, among other things, implement a process by which Generac could accurately determine how many generators needed to be produced in light of inventory already on hand and already in the field. ¶42. According to CW1, prior to the completion of this project, Generac could not reliably determine production needs or track existing inventory levels. ¶¶42-44.

## C. Deteriorating Macroeconomic Conditions Further Prevented Generac from Clearing Excess Inventory.

To make matters worse, worsening macroeconomic conditions were negatively impacting Generac's ability to clear excess inventory and return to normal sales levels. On May 3, when discussing this with investors, Jagdfeld downplayed the effects of the economy, stating in pertinent part that "the biggest thing over my time here, almost 3 decades at the company, is that power outages trump the economy every day of the week." ¶¶35, 71. Contrary to this claim, however, Generac was already experiencing a decline in consumer demand. ¶¶49-50.

CW3—Generac's former Account Manager from June 2019 to August 2023—recalled hearing from Generac's channel partners that "shelves were full, and demand was slowing," and as a result, by 4Q22, customers were left "sitting on tons of inventory." ¶¶48, 50. To drive its own sales growth, Generac began "cutting deals" with these customers, including *inter alia*, offering to sell its HSB units at lower prices and offering extended payment terms, just so it could get "product out the door." ¶¶50-51. These efforts were unsuccessful though and, as a result, Generac was already "seeing a slow-down" in orders from its channel partners during the fourth quarter of 2022. ¶51. Because Generac's customers were "more saturated" than ever by the end of 2022, CW3 said

certain customers decided to decrease their purchases in 2023, while others completely "put on the brakes" in terms of orders because inventory was "not selling." ¶¶51-52.

CW2—Generac's former Plant Controller in Trenton, SC from April 2022 to May 2023—likewise recounted the accumulation of inventory during the fourth quarter of 2022 and into 2023, as customers cancelled orders with Generac because of concerns about interest rates and increasing prices (*i.e.*, worsening macroeconomic conditions). ¶¶45-47. Rather than clearing inventory as reported, Generac continued producing and housing excessive levels of inventory without delivering them to dealers and/or customers. ¶¶43, 46-47.[1]

### D. Generac's Stock Plummeted 25% Overnight After Defendants Revealed the Truth about Their Ongoing Inventory Troubles.

Defendants' May 3 statements about Generac's inventory and market demand came at an important juncture. Generac's stock had been on a steady decline. ¶¶2, 80. Thus, Defendants' positive statements about Generac's progress towards normalizing inventory and sales levels prompted an outsized effect on its stock price, increasing share prices by 11% in a single trading day. ¶¶38. 77-80. Consequently, when Defendants revealed the truth just three months later, the market reacted sharply in the opposite direction. ¶¶53-59, 87-90. On August 2, 2023, Generac revealed that its 2Q23 residential product sales were, in fact, lower than prior expectations due to "softer consumer environment for home improvement" (*i.e.*, low consumer demand) which, in turn, "impacted shipments of home standby generators" (*i.e.*, existing channel inventory levels remained high negating the need for shipments or orders). ¶¶4, 53. Later that same day, Jagdfeld and Ragen disclosed that the decline in consumer demand impeded Generac's ability to "drain the inventory." ¶¶54-56. Inventory "normalization" was now expected to "extend further into the

---

[1] The Complaint's reference to "LitePOWER" generators was a typographical error. CW1 was merely referring to Generac's HSB units as "light power" generators. *See* ¶43.

second half of the year … with the return to year-over-year growth in home standby shipments now anticipated in the fourth quarter." ¶¶54-56. On this news, Generac's stock price fell nearly 25%, or $37.33 per share, to close at $115.95 per share on August 2, 2023. ¶¶4, 59.

## III. RELEVANT LEGAL STANDARD

"A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint, not its merits." *Jones v. Corus Bankshares, Inc.*, 701 F.Supp.2d 1014, 1016 (N.D. Ill. 2010). To survive dismissal, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("The plausibility standard is not akin to a 'probability requirement.'"). In addition to "taking all factual allegations as true," the court must "draw[] all reasonable inferences in favor of the plaintiffs." *Pugh v. Tribune Co.*, 521 F.3d 686, 692 (7th Cir. 2008). To state a claim under Section 10(b) and Rule 10b-5, a complaint must allege: (1) a material misrepresentation or omission (*i.e.*, falsity); (2) scienter; (3) a connection to the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Id.* at 693. Defendants argue dismissal is proper on the grounds that the Complaint does not adequately allege (1) falsity and (2) scienter. Both arguments fail.

## IV. ARGUMENT

### A. The Complaint Alleges Falsity with Particularity.

"[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor: the inquiry … is objective." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186-87 (2015). A statement is actionable if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). The court must consider "the context in which the statement was made." *Rubinstein v. Gonzalez*, 241 F.Supp.3d 841, 851-52 (N.D. Ill. 2017). "Even a statement which is

literally true, if susceptible to quite another interpretation by a reasonable investor, may properly be considered misleading." *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F.Supp.2d 858, 878 (N.D. Ill. 2011); *e.g.*, *Lindelow v. Hill*, 2001 U.S. WL 830956, at *3 (N.D. Ill. July 20, 2001) ("statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors"). In this context, "[i]f one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995).

### 1.    <u>Plaintiff Adequately Pleads False and Misleading Statements.</u>

The Complaint adequately identifies each false or misleading statement (¶¶60, 62-64); who made them (*id.*); when, where, and how (¶¶60-61); and why they were false or misleading when made (¶¶65-67). Nothing more is required. *See Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019); *see also Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *2 (N.D. Ill. Sept. 1, 2020). "It is not the function of [the] Court at the pleading stage to determine whether the statements were in fact false or misleading." *City of Lakeland Emps. Penson Plan v. Baxter Int'l*, 2012 WL 607578, at *2 (N.D. Ill. Jan. 23, 2012). Rather, the court "need only determine that plaintiff has alleged sufficient facts showing the circumstances which plaintiffs claim constitute fraud." *Azar v. Grubhub, Inc.*, 2021 WL 4077327, at *4 (N.D. Ill. Sept. 7, 2021); *see also Allscripts*, 778 F.Supp.2d at 870 (the court asked itself "*could* these things have happened, not *did* they happen").

Defendants overstate the pleading requirements for the element of "falsity" and incorrectly assess Plaintiff's allegations in isolation (by, for example, looking at each statement on its own and not in context).[2] Collectively, Defendants' statements portrayed a highly misleading and

---

[2] Defendants identify each statement by number with reference to an "Appendix." *See* Defs. Br. at 9 n.5. Defendants have not provided this "Appendix" to Plaintiff and/or filed it with the Court.

inaccurate presentation of Generac's then-current business, namely its progress towards and ability to return to normal HSB inventory and sales levels. *See Lindelow*, 2001 WL 830956, at *3 ("a court must consider the statements at issue both individually *and* collectively in the context in which they are made") (emphasis in original). And while each statement is actionable, it only takes one to satisfy the element of falsity. *See Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *8 (N.D. Ill. Oct. 30, 2012) (because plaintiff "met their burden of alleging the first requirement of a Rule 10b-5 claim, the Court need not address the statements in the third category").

On May 3, Defendants spoke at length about Generac's HSB inventory and sales. ¶¶60-64. When discussing Generac's 1Q23 results, Defendants unequivocally stated that "field inventory levels of [HSBs] declined at a rate consistent with our expectations in the quarter," and "with the number of units falling meaningfully and ending the quarter approximately in line with our prior expectations," Generac was currently "making good progress" in its normalization process and was "all in line" to achieve its target of "a return to growth starting in the third quarter." *Id.* These representations signaled to investors that, regardless of the negative impact on sales in 1Q23 and expected impact in 2Q23, Generac's target of achieving normal inventory levels and sales growth in 2H23 was still valid and obtainable. ¶37 (5/4/23 Truist report: "we came away from GNRC's earnings somewhat more encouraged as the company appears to be tracking its targets YTD w/HSB field inventories trending down & [management] reiterating FY guidance.").

Defendants' May 3 statements are classic, actionable "half-truths" and materially misleading omissions. While discussing Generac's historical inventory levels and progress towards bringing them down in 1Q23, Defendants concealed that Generac had at the same time, been producing HSBs at a rate equal to incoming demand thereby preventing it from achieving any meaningful reduction, let alone on the timetable represented in the 2023 outlook. ¶¶65-67.

Further, customers had already "put on the brakes" in terms of orders due to worsening macroeconomic conditions, resulting in stagnant inventory levels instead of the "meaningful" reduction described by Defendants. ¶¶41-43, 46-52. Because Generac's inventory levels were not normalizing in 1Q23, particularly not at the rate considered when setting the 2023 targets, they could not "continue to normalize" in 2Q23. Thus, then-existing facts did not support Defendants' claims that 1Q23 had "marked the trough for home standby shipments" or that Generac would achieve normalized levels and a return to sales growth in the timeline represented. ¶¶3, 39, 65-67.

Defendants' concealment of these facts alone is sufficient to render their May 3 statements actionable, and an abundance of case law supports such a finding. *See Allscripts*, 778 F.Supp.2d at 878-79 (finding statement that "'[w]e did a tremendous amount of work on [the installation] process to make sure that [installation] problems [do not] happen'" actionable where it concealed there were such problems and "may have misled a reasonable investor into developing an overly rosy picture"); *Sequel Capital, LLC v. Rothman*, 2003 WL 22757758, at *11 (N.D. Ill. Nov. 20, 2003) (finding "future projections were misleading and lacked any reasonable basis" where alleged "[d]efendants had knowledge of the losses taking place during the [same time]" as making the optimistic projections); *Jones*, 701 F.Supp.2d at 1020 (finding statements of reserves adequacy actionable where "the complaint alleges numerous facts indicating that [defendant] should have known *ex ante* that the levels of its reserves was insufficient"); *In re NeoPharm, Inc. Sec. Litig.*, 2003 WL 262369, at *13 (N.D. Ill. Feb. 7, 2003) (despite acknowledgement of potential economic harm due to delays in testing a new drug, defendants statements were actionable because they "fraudulently downplayed the significance of the ... delay by not disclosing the serious extent and nature of the problems plaguing [the drug]"); *Next Level Sys. Sec. Litig.*, 1999 WL 387446, at *7 (N.D. Ill. Mar. 31, 1999) (failure to address "several facts that undermine[d] the accuracy of

[company's] forecasts of continued growth, high demand and increased earnings," "each of which would have affected earnings projections, amount[ed] to a material omission").[3]

Defendants attempt to undermine Plaintiff's allegations by attacking the Confidential Witnesses. Defs. Br. at 11-12. Contrary to Defendants assertions, Plaintiff's CW allegations are not subject to a categorical "steep[] discount" just because CW1, CW2, and CW3 are "confidential." *See Ross* 2012 WL 5363431, at *4 (finding categorical discount warranted only "when the complaint lacks enough detail for the Court to determine whether the unnamed witnesses were in a position to know at first hand the facts to which they are prepared to testify.").[4] By "provid[ing] the job title, duration of employment at [Generac], and a description of employee responsibilities" Plaintiff "ha[s] sufficiently described their sources 'to support the probability that a person in the position occupied by the source would possess the information alleged.'" *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.,* 2013 WL 566805, at *17 (N.D. Ill. Feb. 13, 2013); *In re Sinclair Broad. Grp., Inc. Sec. Litig.,* 2020 WL 571724, at *16 (D. Md. Feb. 4,

---

[3] *See also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*") (statements that product demand was "still going strong" and that company "should hit [its] full manufacturing capacity in May or June" actionable); *Desai v. Gen. Growth Props., Inc.*, 654 F.Supp.2d 836, 852 (N.D. Ill. 2009) (statement that company "currently anticipate[s] that [it] will be able to repay or refinance all of [its] debt on a timely basis" was actionable); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 817 (N.D. Ill. 2017) (finding statement that integration activities were "on track" actionable); *Stransky*, 51 F.3d at 1334-36 (statements that products "were coming down on their cost curves" and "were making progress toward their targets" actionable).

[4] Defendants misplace reliance on *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007) and *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.,* 711 F.3d 754 (7th Cir. 2013). "[T]he Seventh Circuit clarified that a particularly troubling use of confidential sources prompted" its prior ruling in *Higginbotham*. *See Tellabs III*, 513 F.3d at 712 (explaining that in *Higginbotham*, the plaintiffs described their confidential witnesses "merely as three ex-employees of Baxter and two consultants," but gave no detail such as their job descriptions). Similarly, the court in *Boeing* discounted references to internal emails where the plaintiffs did not provide any details about the sender or recipient of the emails. 711 F.3d at 759. The plaintiffs successfully amended the complaint by providing the missing information, but things went awry after it was discovered that the confidential witness allegations had been falsified—a scenario which absolutely does not exist here. *Id.* at 759-61.

2020) (crediting allegations from first-hand knowledge acquired through course of employment). And the facts known to the CWs are "set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources." *Tellabs III*, 513 F.3d at 712; *Compare* ¶43 (CW1 describing "rows and rows" of excess inventory at plant, requiring rental of an overflow warehouse due to over production) *with* ¶46 (CW2 corroborating over production requiring excess inventory to be shipped to an overflow warehouse because plant ran out of room); *compare* ¶47 (CW2 confirming canceled shipments and/or orders because of concerns about interest rates and increasing prices) *with* ¶¶49-50 (CW3 corroborating customers were not selling through excess inventory due to slowing demand and by the end of 2022 were canceling and/or reducing orders).

Additionally, Defendants' attempt to discredit CW1 and CW2 based on the timing of their employment is a red herring. Defs. Br. at 13. The "proposed class period dates function only to define the plaintiff class, not to restrict the universe of relevant or actionable facts in this case." *Zelman v. JDS Uniphase Corp.*, 376 F.Supp.2d 956, 971 (N.D. Cal. 2005); *see*, *e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (reversing district court's determination that consideration of pre-class data was irrelevant to defendants' knowledge during class period). Generac employed CW1 from September 2022 to March 2023 (¶40) and CW2 from April 2022 to May 2023 (¶45). All the alleged misstatements concern the financial and operational results for *the three-month period ended March 31, 2023*. ¶¶60-64. Accordingly, CW1 and CW2 can plausibly speak to Generac's inventory levels, production rates, and consumer demand during the relevant time period. "Taken collectively, statements by confidential witnesses establish that members of executive-level management, including individual defendants, had access to and used reports documenting in real time the [production and supply problems] during the Class Period." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017).

**2.** **Defendants' Statements Are Not Mere Matters of Puffery or Opinion.**

Contrary to Defendants' assertions, the challenged statements are not matters of immaterial "puffery" or "opinion." *See* Defs. Br. at 14-18, 22-23. "The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Macovski v. Groupon, Inc.*, 553 F.Supp.3d 460, 476 (N.D. Ill. 2021). Because determining materiality "requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him," it is "rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Computer Ctrs., Inc.,* 122 F.3d 363, 370 (7th Cir. 1997).

Considered in context, each of the challenged statements supports Plaintiff's theory that Defendants communicated a narrative of improvement rather than disclosing the adverse trends affecting Generac's inventory normalization process and return to sales growth. ¶¶60-64. "The significance of this information is illustrated by the frequency with which Defendants emphasized [Generac's HSB production rates, inventory levels, and consumer demand] in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements [regarding HSB inventory levels]." *Atlas v. Accredited Home Lenders Holding Co.*, 556 F.Supp.2d 1142, 1155 (S.D. Cal. 2008); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) ("*Tellabs I*") (statement not puffery when made in response to analyst question); *SEC v. Ustian*, 229 F.Supp.3d 739, 768 (N.D. Ill. 2017) (material where one analyst was "swayed" by the statement). Indeed, Defendants repeatedly discussed HSB inventory levels (*see*, *e.g.*, ¶¶27, 29, 31, 34-35, 53-56, 64) and analysts reiterated those statements in their investment reports to the public (*see*, *e.g.*, ¶30 (multiple analyst reporting on how overstated HSB backlog impacted demand); ¶32 (2/15/23 Baird Equity Research ("BER")

reporting "Management sees strong underlying HSB fundamentals [] that should drive normalized 2H trends as inventory corrects"); ¶33 (2/15/23 J.P.Morgan noting "channel inventory improved slightly" and concluding "[w]e are encouraged that the expected timing of HSB recovery remains unchanged since the 3Q call"); ¶36 (5/3/23 BER reporting "Generac posted healthy 1Q upside, on in-line residential results…Guidance was maintained"); ¶37 (5/3/23 J.P.Morgan reporting "Strong 1Q…FY23 Guidance Reiterated as HSB Channel De-Stocking Tracks Expectations")). Thus, when Defendants told investors on May 3 that they saw "a meaningful reduction" and "[d]ue to ongoing strength in leading indicators of demand for home standby generators…the Company is maintaining its full-year 2023 net sales guidance" (¶60), it is hardly plausible for Defendants to suggest their statements were "so obviously *unimportant* that reasonable minds could not question their materiality." *Groupon*, 553 F.Supp.3d at 476-77 ("whether these particular statements are too vague to be material seems exactly the kind of inquiry that would lead reasonable minds to different conclusions"). The market's reaction to the truth when it emerged further confirms the materiality of the statements. ¶¶57-59; *see e.g. Ross*, 2012 WL 5363431, at *6.

Moreover, "even where a statement is not actionable when considered individually, it can be actionable if it reinforce[s] factual misstatements and therefore contribute[s] to ongoing deception." *Jones*, 701 F.Supp.2d at 1027 (alternation in original). For example, Defendants challenge the isolated snippet "return to year-over-year sales growth" as vague optimism (Defs. Br. at 22) but fail to mention that this statement was embedded within material factual information. ¶62; *Ustian*, 229 F.Supp.3d at 772 (the "context" in which statements are made is "significant" and can "add concreteness to otherwise vague, inactionable statements"). Likewise, a reasonable investor plausibly could interpret "a meaningful reduction in field inventory levels" or "continued to decline towards more normalized levels" to mean the destocking necessary to meet the 2023

outlook. *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *5 (S.D.N.Y. May 1, 2024) (statement that "[w]e feel very good that we have adequate supply" was "not puffery" because "a reasonable investor plausibly could interpret 'adequate supply' to mean the supply necessary to meet demand"); *see also Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2018 WL 844420, at *3 (N.D. Ill. Feb. 12, 2018) (finding statements about "integration team 'doing all the work' and 'an incredible job'" and that "the progress of the [] integration … was 'good,' 'great,' 'gaining momentum,' and showing 'great progress'" material).

Defendants also cannot recast their statements as mere forecasting imprecision. *See* Defs. Br. at 14-15, 22-23. For example, unlike *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.,* 8 F.4th 592, 596-97 (7th Cir. 2021), which concerned predictions about merger synergies involving "another corporation's assets[,]" Defendants' timeline statements here omitted information learned during the first quarter of 2023. *See id.* at 596 ("corporations generally possess good information about completed operations"); *see also In re MGM Mirage Sec. Litig.,* 2013 WL 5435832, at *7 (D. Nev. Sept. 26, 2013) (timeline statements misleading where they knew and omitted facts that the project would not be completed on-time). Likewise, the challenged statements concerning Generac "making good progress" in 1Q23 and the quarter representing "the trough" in terms of its sales woes, are statements of material historical fact that cannot as a matter of law constitute puffery or opinion. *See TreeHouse*, 2018 WL 844420, at *3 (finding statement "'solidly on track to deliver the earnings'" materially misleading because it "conveyed past or present facts" and "g[a]ve false assurances about present company conditions").[5]

---

[5] Defendants misplace reliance on *Martin v. Quartermain*, 732 F.App'x 37 (2d Cir. 2018) and *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F.Supp.3d 737 (S.D.N.Y. 2018). Defs. Br. at 15. The *Martin* court relied on the fact that "all the relevant allegations in the complaint suggest that ... [defendant] believed" the optimistic estimates would prove accurate. *Id.* at 40-41. The *Aratana*

Defendants also incorrectly suggest that *Omnicare* transformed every statement into an inactionable opinion. Defs. Br. at 15. When statements "express[] certainty about a thing," they are not an opinion. *Omnicare*, 575 U.S. at 183 (recognizing the difference between "'the coffee is hot'" and "'I think the coffee is hot.'"); *In re QuantumScape Sec. Class Action Litig.*, 580 F.Supp.3d 714, 739-40 (N.D. Cal. 2022) (distinguishing statements of "'certainty'" from "opinion-qualifying language"). For example, Jagdfeld's statement that "[t]he number of home standby generators in field inventory continued to decline towards more normalized levels during the first quarter, with the number of units falling meaningfully…in line with our prior expectations" is not an opinion. ¶62. Notably, the majority of the challenged statements do not contain the "I believe" or "I think" language flagged in *Omnicare*. 575 U.S. at 186; ¶¶60-64.

Notwithstanding, even if any of the challenged statements were puffery or opinion (which they are not), they are still actionable because Defendants were aware that they omitted facts that rendered the statements materially misleading. *See Jones*, 701 F. Supp. 2d at 1027-28 ("statements that would otherwise amount to puffery can be actionable if the speaker is aware that the statement is deceptive"); *see also Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *7 (N.D. Ill. Feb. 10, 2023) (opinion actionable where defendants knew contradictory facts). Here, Defendants' challenged statements about the progression of Generac's inventory normalization process and return to sales growth were materially contradicted by information in their possession concerning Generac's over-production, idling-high inventory levels, and declining consumer demand. *See* Section IV.A.1., *supra.* In the context of those omissions, Defendants' statements were materially misleading. *See Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *5 (N.D. Ill. Aug. 11, 2021)

court found "[n]early all of defendants' statements…were framed as opinions, forward-looking statements, or both" because they "express[ed] expectations about the future rather than presently existing, objective facts" or were "marked by phases such as 'I believe.'" 315 F.Supp.3d at 758.

(financial performance statements actionable where defendants knew future benefits were not achievable and "would drag the company's performance down"); *see also In re Boeing Co. Aircraft Sec. Litig.,* 2022 WL 3595058, at *25 (N.D. Ill. Aug. 23, 2022) (time estimate "backed by some inquiry" actionable where evidence from inquiry was "decidedly less optimistic" than defendant's representation); *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *15 (N.D. Cal. June 2, 2020) ("[A] party cannot affirmatively create a positive impression of an area it knows to be doing poorly."). In other words, Defendants cannot credibly claim to have believed that inventory levels had "fall[en] meaningfully" in 1Q23 marking "the trough for home standby shipments" and supporting "normalized levels" in 2H23 because these statements did not "fairly align[] with the information in [their] possession at the time." *Omnicare,* 575 U.S. at 189; *In re SCANA Corp. Sec. Litig.,* 2019 WL 1427443, at *9 (D.S.C. Mar. 29, 2019) (timeline statements actionable where defendants "could not have sincerely believed" timeline given contradicting facts).

### 3. <u>Defendants' Statements Are Not Protected Under the Safe Harbor.</u>

Defendants argue that most of the challenged statements are protected from liability as forward-looking statements accompanied by meaningful cautionary language. Defs. Br. at 18-22. This argument fails for several independent reasons. *First*, the safe harbor is inapplicable because the challenged statements omitted material adverse information. *See Takara Tr. v. Molex Inc.*, 429 F.Supp.2d 960, 974 (N.D. Ill. 2006) ("it is axiomatic that the failure to make a statement cannot be forward looking"); *see e.g.*, *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016) ("The safe harbor … does not protect material omissions."). This is true "regardless of whether the statements thereby rendered misleading were forward-looking." *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013); *see also Selbst v. McDonald's Corp.*, 2005 WL 2319936, at *9 (N.D. Ill. Sept. 21, 2005) ("[A] speaker is liable if

the [forward-looking] statement contains an omission of a known material fact which makes the affirmative statement misleading or false, or unreasonable.").

*Second*, the safe harbor does not apply to statements that are "in fact firmly planted in the present or past." *Hedick*, 2021 WL 3566602, at *15 (finding statements with verbs such as "is," "are dealing with," "are now," and "are increasing" were "describing the Company's current status and actions, and a single reference to 'the future' does not yank the entirety of the utterance into the realm of a forward-looking statement"); *Tellabs III*, 513 F.3d at 705 (statements that sales were "still going strong," "we should hit our full manufacturing capacity," and were "on track" to hit certain revenue targets, mixed present/future statements not entitled to safe-harbor protection). Likewise, statements regarding "progress" are actionable historical statements when they diverge from internal targets. *Stransky*, 51 F.3d at 1334-35 (finding "'were making progress toward their targets'" a "historical statement[]"); *see also Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, 690 F.Supp.3d 862, 879 (N.D. Ill. 2023) (finding "'continues to match its clinical staffing levels accordingly' … and [] was 'on track' to meet its 2021 target for new clinics … communicated then-existing, concrete facts"). Each challenged statement here includes numerous representations of past or present performance, and/or qualify as historical statements. *See* ¶¶60-64.

*Third*, "[t]o be effective, the cautionary language 'must be substantive and tailored to the specific future projections, estimates or opinions in the [document] which the plaintiffs challenge.'" *Hedick*, 2021 WL 3566602, at *15. Determining what constitutes "meaningful cautionary language" is "difficult if not impossible" to decipher, especially "at the pleading stage." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004). It is Defendants burden to show the "cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010). Defendants claim that each of the challenged

statements was accompanied by meaningful cautionary language, yet fail to identify *any* purported warnings, meaningful or otherwise, in the May 3 investor call. *See* Defs. Br. at 6, 19-20 (citing Ex. 4, Generac's May 3 press release). Instead, Defendants cite cautionary language from the May 3 press release while at the same time failing to argue (and therefore waiving) that the investor call incorporated the cautionary language from the press release. Regardless, the investor call does not "specifically reference other factors listed in [Generac's] filings with the SEC." *Stavros v. Exelon Corp.*, 266 F.Supp.2d 833, 844 (N.D. Ill. 2003); *see also Lindelow*, 2001 WL 830956, at *5 (rejecting purported "cautionary language" in press release "refer[ing] the reader to Moon's publicly filed records" as "boilerplate and not tied to the specific projections made by defendants"). Accordingly, even if these statements were forward-looking (they are not), Defendants failed to show they were accompanied by meaningful cautionary language, and therefore, are actionable.

*Fourth*, Defendants point to "a number of" factors that "could impact demand" (Defs. Br. at 19-20) amounting to nothing more than insufficient boilerplate warnings that "'all businesses are risky' or 'the future lies ahead.'" *Asher*, 377 F.3d at 732-33. Defendants "cannot simply include a generic list of factors that might affect future performance," *TreeHouse*, 2018 WL 844420, at *3 (no protection where "[d]efendants did not disclose any specific concerns"); nor does it suffice to simply "highlight[] some parts of the business that might cause problems," *Asher*, 377 F.3d at 733. The "warnings" identified here are not substantive or tailored to the specific risks impacting Generac's financial performance—*i.e.*, over-production and inventory saturation due to inadequate internal reporting. *See Hedick*, 2021 WL 3566602, at *16 (rejecting "relatively broad" warnings that "do not resemble the highly specific cautionary statements that courts have approved").

*Fifth*, "Defendants cannot seek safe harbor refuge by representing a risk that already has materialized [], as a risk that could develop in the future." *Van Noppen v. InnerWorkings, Inc.*, 136

F.Supp.3d 922, 949 (N.D. Ill. 2015). For cautionary language to protect a defendant from liability, it must disclose the "major risks [it] objectively faced when it made its forecasts." *Asher*, 377 F.3d at 734. Here, Generac was already experiencing a negative impact on consumer demand due to deteriorating macroeconomic conditions, which, in turn, exacerbated Generac's excess inventory problems, inhibiting its destocking process and sales prospects. *See Pierrelouis v. Gogo, Inc.*, 2021 WL 1608342, at *11 (N.D. Ill. Apr. 26, 2021) (finding defendant's caution vague "in comparison with what plaintiff allege[d] to have been happening behind the scenes" and "if plaintiff's allegations are true, then [defendant] did not precisely disclose the exact risk that materialized.").

*Sixth*, the statements are still actionable because they "w[ere] not made in good faith or w[ere] made without a reasonable basis." *Selbst*, 2005 WL 2319936, at *8. In this context, actual knowledge does not mean knowledge, to a degree of certainty, that a projection is impossible to meet. Rather, a forward-looking statement is made with actual knowledge of falsity if the speaker has knowledge of any undisclosed facts tending to seriously undermine the accuracy of the statement. *See Slayton*, 604 F.3d at 774. "A defendant thus may be liable for issuing a future projection … if the defendant ignored facts seriously undermining the accuracy of the forecast." *Selbst*, 2005 WL 2319936, at *9. Putting aside that Defendants reaffirmed the 2023 target midway through 2Q23, in the throes of ongoing inventory and demand problems (revealed three months later), as discussed *supra*, Defendants knew their statements were misleading when made because they knew or had access to contradicting facts including that, Generac's target was based on inadequate information, and that sustained over-production and declining demand had already resulted in idling-high inventory levels, and impacted its destocking process and sales prospects. These undisclosed facts seriously undermined the accuracy of Defendants' statements, and thus, are actionable. *Iles v. Swank*, 2006 WL 1806365, at *4 (N.D. Ill. June 28, 2006) ("[T]he dichotomy

between the positive statements ... and the alleged financial difficulties facing [defendant] … indicate that the statements were not made in good faith or with a reasonable basis.").

**B.      The Complaint Alleges a Strong Inference of Scienter.**

A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *TreeHouse*, 2018 WL 844420, at *1. A defendant acted with scienter if he "knew the statement was false or was reckless in disregarding a substantial risk" that it was false or misleading. *Tellabs III*, 513 F.3d at 704. Recklessness is sufficiently pleaded when the substantial risk was "so obvious that the defendant must have been aware of it." *Tellabs III*, 513 F.3d at 704. A strong inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) ("*Tellabs II*"). Rather, it need only "be cogent and at least as compelling as any opposing inference[.]" *Id.* at 314. The scienter inquiry is holistic and asks, "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs II*, 551 U.S. at 322-23.[6] Considered holistically, Plaintiff's allegations support a strong inference that Defendants made the alleged misstatements knowingly, or at a minimum, recklessly.

**1.      <u>Defendants Knew or Had Access to Adverse Information.</u>**

Plaintiff alleges with particularity "[o]ne of the classic fact patterns giving rise to a strong inference of scienter," that Defendants "knew or had access to information suggesting that their public statements were materially inaccurate." *Flynn v. Exelon Corp.*, 2021 WL 1561712, at *10

_____

[6] *See also Norfolk Cty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *11 (N.D. Ill. July 28, 2009) ("defendants cannot defeat a complaint by 'cherry picking' particular allegations that, standing alone, might not meet the heightened pleading standard under Rule 9(b) or the PSLRA."); *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008) ("[W]here there are equally strong inferences for and against scienter, *Tellabs*[] awards the draw to the plaintiff.").

(N.D. Ill. Apr. 21, 2021). *First*, the fact that Defendants made the false and misleading statements, as shown above, itself supports an inference of scienter. *Jones*, 701 F.Supp.2d at 1022 ("An inference of scienter is supported, first of all, by Corus's awareness of the discrepancy between its public statements about its finances and the corporation's true financial condition."); *Lindelow*, 2001 WL 830956, at *7 (finding allegations of misrepresentations "support[] a strong inference of scienter"). Simply put, an inference can be made that Defendants knew of what they spoke. *Id.*

Moreover, the closer the alleged misstatement is related to a "core operation[]" or "key product," the more reasonable it is to infer that senior management knew or should have known it was misleading when made. *Tellabs III*, 513 F.3d at 709-11. Here, Defendants cannot refute that Generac's most important Class Period initiative was the production and sale of HSB units, and that its future success depended on HSB revenue. ¶¶23-26, 32-33, 35-38. Nor can they contest that the inventory problems plaguing HSB sales were pervasive. ¶¶27, 29-31. Indeed, CW1 described the large amount of "backstock" inventory as a "running joke" amongst the finance and cost accounting groups (¶43), and CW3 confirmed the inventory problems adversely impacted multiple channel sales, including to retailers and wholesalers (¶52). Accordingly, the "core operations" inference applies here. *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F.Supp.2d 722, 727 (N.D. Ill. 2003) ("Officers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance.'").[7]

---

[7] *See*, *e.g.*, *Silverman v. Motorola, Inc.,* 2008 WL 4360648, at *14 (N.D. Ill. Sept. 23, 2008) (scienter where defendants were assumed to know about "production problems faced by the significant new product launch in the division that accounted for the largest share of sales in the company"); *Desai*, 654 F.Supp.2d at 860 (concluding "where a company was experiencing 'a deep and pervasive corporate illness,' it certainly followed that every officer or director of the company knew of the 'extraordinarily serious financial difficulties' faced by the company or if not, that a failure to have that knowledge would equate to reckless disregard"); *see also Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 937 (7th Cir. 2018) (indicating core operations inference applies where the practices "are a significant part of [company]'s financial picture.").

*Second*, Defendants admitted that they were *highly focused on monitoring* the customer sale cycle and inventory levels. ¶¶69-74. For example, on various earnings calls with analysts, Jagdfeld explained that Generac monitors "[s]everal key metrics" including "[a]ctivations," "in-home and virtual consultations," and "close rates" claiming Defendants track "a lot of data … down to the zip code level in areas"—*i.e.*, channel checks. ¶69. Defendant Ragen echoed Jagdfeld, specifically claiming that Generac started "tracking the metric" of "[h]ome consultations or sales leads" in 2013. ¶69. Following the implementation of new internal reporting by February 2023 (¶¶41-42), Jagdfeld admitted in August 2023 that in addition to channel checks, Defendants also "know what field inventory looks like really with a high degree of accuracy region to region and dealer-to-dealer, wholesale to wholesale or retailer to retailer." ¶69. These allegations support an inference of scienter. *See Carpenters Pension Tr. Fund for N. CA v. Allstate Corp.*, 2018 WL 1071442, at \*6 (N.D. Ill. Feb. 27, 2018) (finding scienter where defendant analyzed claim frequency during the class period and later admitted that increased frequency was "expected").[8]

*Third,* former employees confirmed that, through receipt of regular reports, notifications from channel partners, and even hands-on budget meetings, Defendants were kept apprised of Generac's inventory normalization process and deteriorating macroeconomic conditions further impacting the destocking process and sales prospects. As confirmed by the accounts of CW1, CW2, and CW3, the Company's lack of internal reporting on HSB inventory and production resulted in sustained overproduction out pacing demand throughout 4Q22 and into 1H23, clogging

---

[8] *See*, *e.g.*, *Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*, 2012 WL 4049953, at \*2-\*3 (S.D.N.Y. Sept. 14, 2012) (scienter where defendants represented "they closely monitored" the fraud subject either because "failed to perform the monitoring they claimed to have performed or they uncovered [the truth and] knowingly or recklessly misrepresented the circumstances"); *In re BP p.l.c. Sec. Litig.*, 843 F.Supp.2d 712, 783 (S.D. Tex. 2012) (defendant's repeated statements "weigh strongly in favor of the inference that" he "paid special attention" to the fraud subject "or, at the least, was reckless in not doing so while continuing to publicly tout improvements").

Generac's facilities and channel partners with excess inventory at levels higher than those considered when setting the 2023 target, in November 2022 and reaffirmed in February 2023. ¶¶41-43, 46-47, 49-51, 75-76. Once the project designed to rectify these deficiencies, including implementation of a "supply schedule" at each of the Company's plants, requiring production and inventory levels to be reported monthly, was completed in January or February of 2023, Defendants had access to newly implemented production reports describing "rows and rows" of excess inventory existing at Generac's HSB plants and overflow warehouses. ¶¶42-43, 46-47.

In addition, CW3 described channel partners, as of 4Q22, reporting "shelves were full and demand was slowing" and seeking assistance from Generac to sell through excess inventory, which prompted the Company to offer rebates to drive consumer sales. ¶¶49-51. To drive its own sales, CW3 recalled Generac began "cutting deals" with customers, including *inter alia*, offering HSB units at lower prices and on extended payment terms. ¶50. CW3 confirmed that such concessions exceeded the authority of the sales credit team, meaning these matters undoubtably would have been elevated to the "executive level," including Defendants. ¶52. These efforts, however, did not alter the declining demand and, as of 4Q22, Generac was already "seeing a slow-down" in orders, and by the end of 2022, customers had decided to either decrease their purchases in 2023 or completely "put on the brakes" in terms of orders or shipments. ¶51. CW2 likewise recounted the accumulation of excess inventory at Generac's HSB facilities throughout 4Q22 and 1H23 resulting from canceled shipments or orders due to macroeconomic conditions. ¶47. As confirmed by CW3, there is "no question" that inventory problems and limited sales prospects stemming from a decline in demand would have been discussed by Defendants in conjunction with the 2023 budget. ¶52.

Accordingly, Defendants' scienter is thus strongly supported by their receipt of and exposure to specific, detailed information contradicting their Class Period public representations

that Generac was "making good progress" in the HSB destocking process or had seen "a meaningful reduction in field inventory levels for these products," that "the first quarter marked the trough for home standby shipments in the current channel destocking process," and that the Company was still capable of achieving "a return to year-over-year sales growth in the second half of the year as field inventory returns to more normalized levels." ¶¶60-64.

Defendants' reliance on *Fryman v. Atlas Financial Holdings, Inc.*, 462 F.Supp.3d 888 (N.D. Ill. 2020), and *Pierrelouis v. Gogo, Inc.*, 414 F.Supp.3d 1164 (N.D. Ill. 2019) is misplaced. *See* Defs. Br. at 27. The *Fryman* court found merely alleging defendants used "predictive analytics" and close monitoring of reverses insufficiently particular to establish they "had access to information that undermined the veracity" of their statements. *Id.* at 898, 902. Here, the Complaint details the historical inventory and sales data Defendants possessed—and omitted from disclosure—during the Class Period. *See* ¶¶41-44, 46-47, 49-52, 69-76. And unlike *Gogo*, Plaintiff "describ[es] specific documents containing that data or otherwise alleg[es] that the data was available to the defendants in some specific form." 414 F.Supp.3d at 1174-75; ¶¶41-42, 52, 69.

This case likewise bears no resemblance to *Chandler v. Ulta Beauty, Inc.*, 2022 WL 952441 (N.D. Ill. Mar. 30, 2022), where plaintiffs failed to allege whether the defendants "ever accessed the alleged [reports or guidance]" or "had any role in preparing, or directing someone to prepare the reports or [guidance]." *Id.* at *27-*28. Here, Plaintiff alleges CW1 was directly tasked with designing and implementing the production reports, beginning in November 2022, the same month the 2023 outlook was set, completed as of February 2023. ¶42. As Plant Controller, CW2 managed and recorded plant finances, including the new production reports. ¶¶44-45. CW1 and CW2 both reported to Generac's Senior Director, Operations Finance, Laurie Flagel, who, in turn, reported to Ragen. ¶¶40, 45. CW3 described how Generac's field inventory levels existing at the end of

2022 and its expected sales in the upcoming year, based on inventory levels and in consideration of demand indicators, were undoubtably topic of conversation during the Company's 2023 budget process. ¶52. CW3 recounted engaging in first-hand discussions regarding the alleged excess inventory problems with Generac's Vice President, Erik Anderson who, in turn, participated in budget discussions with Jagdfeld. *Id.* Defendants' claim that Plaintiff must point to "specific information in [] reports or systems" contradicting their public statements (Defs. Br. at 27) is also incorrect. *See Allison*, 2023 WL 1928119, at *10 (rejecting proposition that "allegations of specific reports, conversations, or meetings demonstrating the defendants' knowledge are required to plead a strong inference of scienter"). *See also TreeHouse*, 2018 WL 844420, at *3 ("Even though the PSLRA imposes a heightened standard, it requires no proof as opposed to plausible allegations."); *Friedman v. Rayovac Corp.*, 295 F.Supp.2d 957, 987 (W.D. Wis. 2003) (Rule 9(b) and the PSLRA do "not require the pleading of detailed evidentiary matters").

Moreover, while Defendants criticize Plaintiffs' reliance on CWs to corroborate liability (*see* Defs. Br. at 12-14, 24-25), the relevant question is whether it is reasonable to infer from the allegations that Generac's CEO and CFO knew or recklessly disregarded the extent to which such long-running and pervasive problems undermined their representations to investors. The answer is plainly yes. *See Ross*, 2012 WL 5363431, at *9 (scienter where "the CWs cited by plaintiffs … detailed facts supporting the claim that defendants' practice of improperly inflating job placement statistics was both widespread and pervasive"). Additionally, "[t]hat some of the [CW]s lacked direct contact with the [Individual] Defendants does not undermine their evidence." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *10 (S.D.N.Y. May 24, 2018). The CWs "detail[] the types of relevant information made available to senior executives," and they confirm that information regarding significant production and inventory management problems was

"discussed at [regular] meetings." *Id*.; ¶¶43-44, 52. These accounts "taken together are sufficient to raise a strong inference of scienter." *In re Chi. Bridge*, 2018 WL 2382600, at *10; *see also Grae v. Corr. Corp. of Am.,* 2017 WL 6442145, at *20 & n.8 (M.D. Tenn. Dec. 18, 2017) (scienter where, *inter alia,* confidential witness "confirm[ed] that ... the ongoing QAD tracking included the results of [Bureau of Prisons] audits and Notices of Concern and ... [defendants] were among the senior executives who routinely received QAD information," notwithstanding that witness did "not claim[] to have spoken directly to any of the Individual Defendants"); *Sinnathurai v. Novavax, Inc.*, 645 F.Supp.3d 495, 526 (D. Md. 2022) ("A CW report that the senior company official making public statements remained abreast of the relevant issues is probative on the issue of scienter."); *Ross*, 2012 WL 5363431, at *9 (scienter where concealed facts "were widely and regularly discussed on weekly conference calls"); *Robb v. Fitbit Inc*, 2017 WL 219673, at *7 (N.D. Cal. Jan. 19, 2017) (non-defendant executives' awareness of defects gave rise to inference that they would not keep that "secret from the company's CEO, CFO, and CTO").

*Fourth*, Plaintiff alleges that Jagdfeld and Ragen controlled all aspects of Generac, had access to proprietary company information, controlled its public statements, approved and reported its misleading financial and operational results, and made numerous public statements regarding the Company's production rates, inventory levels, consumer demand, and sales prospects both before and during the Class Period. *See* ¶¶29, 31, 34-35, 60-64, 83-86. Accordingly, the Court may "readily and reasonabl[y] infer" from Defendants repeated references in public statements that they "***made it [their] business to look into these issues***." *Ross*, 2012 WL 5363431, at *10; *see also Baxter*, 2012 WL 607578, at *4 (a reasonable person could infer deliberate recklessness based in part on party's position, access to non-public information, and control of company statements).

*Fifth*, Defendants' unprompted statements and responses to questions raised by analysts about Generac's inventory normalization process and factors influencing HSB sales, further supports an inference that they knowingly concealed the adverse information. ¶¶29, 35, 54-56, 62-64; *Holwill*, 2020 WL 5235005, at *5 ("Defendants' numerous statements regarding AbbVie's sales and marketing practices and programs, and the importance that Defendants placed on those practices and programs to AbbVie's and Humira's growth and success[,] constitute strong circumstantial evidence that Defendants had detailed information regarding AbbVie's sales and marketing practices and programs"); *Allscripts*, 778 F.Supp.2d at 884 (defendant's "direct response to an analyst question regarding [] risks" when alleged that such adverse facts already existed, "suggest[s] that [defendant] spoke with a reckless disregard").

In sum, Defendants cannot now claim they were ignorant to the varied and significant deficiencies plaguing Generac's inventory and sales, especially where corporate management was aware of the overproduction, idling-high inventory levels, and declining customer orders or shipments. *See Jones*, 701 F.Supp.2d at 1028 ("Corus overlooks the fact that officers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance"); *Lindelow*, 2001 WL 830956, at *8 ("[I]t is strongly inferential that every officer or director … either had the knowledge" of these core matters "or, if not, that his failure to have such knowledge equated to reckless disregard"). Plaintiff's inference of scienter outweighs Defendants' inference of nonculpable conduct. *Tellabs III*, 513 F.3d at 709-11 ("[i]s it conceivable that [the CEO] was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely").

## 2. Motive Allegations Bolster Scienter Inference.

While not required, "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." *See Hospira,* 2013 WL 566805, at *16. Plaintiff alleges that Jagdfeld and Ragen each stood to gain so long as the alleged adverse information was concealed because their executive compensation was tied directly to Generac's stock price. ¶¶2, 80. Defendants made the challenged statements when competitors were already reporting operational difficulties due to macroeconomic conditions. ¶77. Defendants' May 3 representations touting Generac's strong consumer demand, had an outsized effect on the Company's stock price, leading investors to purchase Generac stock at elevated levels relative to its competitors. ¶¶38, 77-79. More specifically, Defendants' misstatements caused Generac's stock price to increase by over 11% on May 3, 2023, and it continued to maintain elevated market prices throughout the Class Period, hitting a 52-week high in August 2023, shortly before the truth was revealed. *See id.* Consequently, because of Defendants' successful efforts to drive up Generac's stock price, Jagdfeld and Ragen each received equity-based awards of approximately $5.7 million and $1.3 million, respectively, the value of which was tied directly to the Company's stock price. ¶82. In addition, Jagdfeld took advantage of the Company's inflated stock price during the Class Period, selling 15,000 shares for gross proceeds of more than $2 million. *Id.* "Personal profit, coupled with professional motives to hide internal weaknesses ... lend weight to not only a cogent inference of scienter, but a compelling one in light of the alternative suggested by defendants"— which was nothing (Defs. Br. at 29). *Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009); *see also Allison*, 2023 WL 1928119, at *9 (allegations that "directly tie the defendants' incentive awards to the concealment of [adverse information]" support motive);

*Holwill*, 2020 WL 5235005, at *5 (allegations that defendants' "compensation was tied directly" to flagship drug sales supported scienter inference).

Defendants' reliance on *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952 (7th Cir.2012), is misplaced. *See* Defs. Br. at 25-26. In *Zimmer*, the court concluded that because the alleged misstatements concerned "one plant and one product that together produced less than 10% of the firm's income," undermined plaintiffs' allegation that defendants "had an incentive to make Zimmer look good in order to keep their jobs, improve their bonuses, and increase the value of their stock options," such that it required an inference that "they were putting their fortunes and careers at stake in exchange for very little return." 679 F.3d at 956. Here, the alleged misstatements concerned Generac's most important initiative, a return to normal levels of HSB inventory and sales growth, which its future success depended on. ¶¶23-26, 32-38, 60-64. Plaintiff also alleges that the concealed facts—*i.e.*, Generac's sustained over production that went unresolved in 4Q22 and 1H23 because of inadequate internal reporting resulting in excess inventory persisting at levels higher than those considered when the target was set, and existing negative macroeconomic conditions impacting demand and further inhibiting its destocking process—severely undermined or invalidated Generac's inventory normalization and sales prospects. ¶¶39-59, 65-76. "Accordingly, the differences in the magnitude, timing, and nature between the alleged misstatements and the supporting allegations in *Zimmer* and those Plaintiff[] identify here raise different inferences in the scienter analysis." *Hospira*, 2013 WL 566805, at *27 (rejecting defendants' comparison to *Zimmer* where, as here, the alleged misstatements concerned the company's "crown jewel"). Moreover, unlike here, *Zimmer* plaintiffs did not provide any

specific allegations of personal financial gain tied to the alleged fraud. *See* 679 F.3d at 956.[9]

Defendants are also wrong to suggest that the lack of individual stock sales by Ragen "negates any inference" of scienter. *See* Defs. Br. at 27-29. Their argument conflicts with *Tellabs II*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal"), especially where Plaintiff has sufficiently alleged Ragen's motive based on the direct tie of his incentive awards to the alleged fraud. *See Jones*, 701 F. Supp. 2d at 1025 ("[S]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period."); *see e.g., Allscripts*, 788 F. Supp. 2d at 886; *see also Allison*, 2023 WL 1928119, at *9 n.3 ("Because the Court finds [direct tie of incentive awards] allegations sufficient to allege the defendants' motive, there is no need to resolve whether the defendants' stock sales also suggest that the defendants had motive.").

### C.   The Complaint Adequately Pleads Control Person Liability.

Because Plaintiff adequately pled a primary violation, he has rebutted Defendants' only challenge to Section 20(a) secondary liability. Defs. Br. at 30; *Molex*, 429 F.Supp.2d at 983. They cannot now contest this point. *See Luellen v. City of E. Chi.*, 350 F.3d 604, 612 n.4 (7th Cir. 2003).

### V.   CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety.[10]

---

[9] Defendants' reliance on *Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp,* 2022 WL 1642221 (N.D. Ill. May 24, 2022) and *In re Brightpoint, Inc. Sec. Litig.*, 2001 WL 395752 (S.D. Ind. Mar. 29, 2001) is also misplaced. Defs. Br. at 25-26. The *Brightpoint* court recognized that "scienter may arise where the complaint sufficiently alleges that the defendants benefitted in a concrete and personal way" but found allegations that defendants had motive "because of the significant reputational and monetary benefits they stood to gain from a positive public perception of Brightpoint," "do not provide an adequate foundation for such a finding." *Id.* at *14. The *Fifth Third* plaintiff, unlike here, "does not tie [individual defendants'] incentive compensation specifically to the challenged practices." 2022 WL 1642221, at *23.

[10] Alternatively, Plaintiff respectfully requests any dismissal be done so without prejudice and with leave to amend. *See Macovski v. Groupon, Inc.*, 2021 WL 1676275, at *6 (N.D. Ill. Apr. 28, 2021).

DATED: August 20, 2024

Respectfully Submitted,

MALLERY SC


s/ Andrew G. Frank
Andrew G. Frank
731 North Jackson Street, Suite 900
Milwaukee, Wisconsin 53202
Tel: 414.271.2424
Fax: 414.271.8678
Email: afrank@mallerysc.com

*Liaison Counsel for Plaintiff and the Class*


LEVI & KORSINSKY, LLP

Adam M. Apton
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Lead Counsel for Plaintiff and the Class*