UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

--------------------------------------------------------------------

CHRISTOPHER WALLING,                     )
                                         )
                    Plaintiff,           )   Case No. 24-CV-240
                                         )   Milwaukee, Wisconsin
        vs.                              )
                                         )   February 4, 2025
GENERAC HOLDINGS, INC., et al,           )   10:00 a.m.
                                         )
                    Defendants.          )
                                         )
--------------------------------------------------------------------

**TRANSCRIPT OF MOTION HEARING**
BEFORE THE HONORABLE PAMELA PEPPER
UNITED STATES CHIEF DISTRICT JUDGE

APPEARANCES:
 For the Plaintiff
 Christopher Walling:              Levi & Korinsky LLP
                                   By: Adam Marc Apton
                                   33 Whitehall St - 17th Fl
                                   New York, NY 10004
                                   Ph: 212-363-7500
                                   aapton@zlk.com

                                   Mallery SC
                                   By: Andrew Gerritt Frank
                                   731 N Jackson St - Ste 900
                                   Milwaukee, WI  53202-4697
                                   Ph: 414-271-2424
                                   Fax: 414-271-8678
                                   afrank@mallerysc.com
 For the Defendant
 GENERAC HOLDINGS, INC.:           Mayer Brown LLP
                                   By: Glenn Vanzura & Jacqueline M
                                   Vallette
                                   333 S Grand Ave  - Ste 4700
                                   Los Angeles, CA 90071
                                   Ph: 213-229-5109


 U.S. Official Transcriber:        SUSAN M. ARMBRUSTER, RMR, FCRR
 Transcript Orders:               Susan_armbruster@wied.uscourt.com

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.

TRANSCRIPT OF PROCEEDINGS

Transcribed From Audio Recording

\*   \*   \*

THE CLERK:  The Court calls civil case, Case No. 24-CV-240, Christopher Walling v. Generac Holdings, et al. Please state your appearances starting with the attorneys for the plaintiff.

MR. FRANK:  Good morning.  Andy Frank, of the Mallery Law Firm, local counsel for the plaintiff.

MR. APTON:  Good morning.  Adam Apton, of Levi & Korinsky, lead counsel for plaintiff.

THE COURT:  And for the defendants.

MR. VANZURA:  Good morning.  Glenn Vanzura and Jacqueline Vallette, of Mayer Brown, for Generac Holdings, Aaron Jagdfeld and York Ragen.

THE COURT:  Good morning to everyone.  This is Judge Pepper, and we scheduled this hearing this morning for argument, if you'd like to make it, on the motion to dismiss.  I've reviewed the pleadings, and I want to give you all an opportunity to discuss whatever you'd like to discuss or highlight whatever you'd like to highlight, but I will share with you in the event that's of any help that I have a special interest in any light you can shed on two issues.

The first one has to do with the sort of materiality element when it comes to the defendants' assertions that the

number of the statements that the plaintiff's identified were puffery. The defendant argues pretty much that's all they were. There was nothing particularly material about them. And among other things, there are a number of reasons that the defendant gave, they are arguing that these statements are puffery. But the piece I'm particularly interested in, I'm interested in hearing comments from both sides about, are the facts that there is a good deal of information in the record in front of me showing that there were analysts who were either repeating some of the statements that the defendants made regarding the HSB inventory levels or apparently relying on them in some way.

And I'm curious as to why that in and of itself does not demonstrate the materiality of those statements. If we actually have analysts either repeating them or reiterating them in various reports or relying on them, why is that not evidence of materiality and therefore an indication that the statements were not puffery? So that's issue number one that I'm interested in.

And then issue number two that I'm interested in hearing from both of you about, both sides about, has to do with the scienter element. I am interested in I guess in that respect two different pieces.

The first piece is I'm interested in any evidence or lack of evidence that either of the two individual defendants had any actual knowledge at the time they made the statements

that contradicted the statements. As far as I can tell as best I can tell from the record as I've reviewed it, the CWs as they are called, the confidential witnesses, do not say that either of the individual defendants had any report or at least that they saw either of the individual defendants receive any report or receive any information that contradicted the statements they made on May 3rd.

We've got one confidential witness who sort of speculates about a topic of conversation that might have happened or things that might have been discussed at certain meetings that the two individual defendants attended. But the confidential witness also admits that he/she was not present at those meetings. So I am interested in any information at all or any record evidence I should say, I want to be clear, that shows that the two individual defendants had specific knowledge that the statements they were making were not accurate as of the time they made them on May 3rd.

And then the second piece of that with regard to the scienter is how any of the sort of circumstantial evidence I suppose, the core operations evidence and things of that nature, how any of that actually demonstrates the kind of specific scienter that's required for these sorts of actions.

So again, I am -- I am happy to hear whatever argument you want to make on any of the topics that are raised in the motion, but I'm specifically interested in any further

4

gloss you can put on those two issues. So with that, I will turn to Mr. Vanzura and Ms. Vallette to begin because, of course, this is you all's motion.

MR. VANZURA: Thank you, Your Honor. This is Glenn Vanzura. I appreciate the opportunity to address the Court, and I appreciate the Court's comments. I will address each of your comments and questions, and I have a couple of very brief additional points that I'd like to make without reiterating in any detail what you've already seen in the papers because I know the Court has been careful and mindful of what's already in the papers.

I'd like to start, Your Honor, with the second question you raised as to scienter, and I do that for two reasons. The first is that if the Court determines that plaintiff has not adequately plead scienter, then we need not reach anything else in the papers, including the Court's concern about the materiality/puffery argument. Plaintiff's failure to plead scienter is fatal to the complaint and must be dismissed on that ground alone.

But the Court is exactly right. We, on behalf of defendants, obviously agree that the complaint fails to plead any specific or actual knowledge by Mr. Jagdfeld or Mr. Ragen at the time they made the May 3rd statements that would demonstrate that they had contradictory information or did not believe the expectations, the predictions that they were expressing and

Case 2:24-cv-00240-PP    Filed 02/12/25    Page 5 of 33    Document 42

providing to the market on May 3rd. And I'd like to address that, and I'll address specifically Your Honor's point about the confidential witnesses in just a moment.

But what Your Honor is getting at a little bit is what this case is really all about, and plaintiff outlines in the very first paragraph of his opposition brief his view of what was supposedly known or should have been known and wasn't disclosed on May 3rd.

Now, the complaint points and spends quite a bit of time talking about excess inventory issues that were facing Generac beginning prior to 2023 but continuing through 2023. And the complaint admits that Generac made ample disclosures about those excess inventory issues, and the complaint even describes some of those disclosures. So there's really no question or dispute about that, and that's frankly what most of the complaint dwells on.

And almost all of the confidential witness allegations say nothing more than Generac had an excess inventory issue it was working through, and I'll give Your Honor just one example that's in the complaint at paragraph 52. Plaintiff alleges "there is no question" that Mr. Jagdfeld knew about "the excess inventory by the end of 2022."

Plaintiff is right about that. Generac did have excess inventory. They did know about it by the end of 2022, but these kinds of allegations are entirely unremarkable by the

confidential witnesses. And the reason for that is because again, Generac and Mr. Jagdfeld repeatedly disclosed and forthrightly discussed the issues with the investors on numerous occasions.

Now, Your Honor pointed to the allegation, it's an allegation by CW3. Again, it's outlined in paragraph 52. And if you look carefully at that paragraph, other than saying that Mr. Jagdfeld knew about excess inventory by the end of 2022, it doesn't say anything about what he or Mr. Ragen knew or were relying on when they expressed their predictions on May 3rd of 2023.

In fact, there's nothing in this paragraph, Your Honor, about Mr. Ragen at all and what he supposedly knew or role he played in the budgeting process or what discussions the confidential witness might speculate he "would have had." There's nothing about Mr. Ragen here.

Even with respect to Mr. Jagdfeld, we did point this out in our papers, it is speculation as to what he would have discussed or what he would have known. And even there reading from line 4 of paragraph 52, plaintiff alleges the excess inventory problem would have been discussed between Anderson and defendant Jagdfeld in conjunction with the 2023 budget process. That tells us nothing.

First of all, let's put aside the fact it's pure speculation. And as Your Honor pointed out, CW3 wasn't in the

room, and he does not know what was actually discussed or she doesn't know exactly what was discussed. Even putting that speculation aside, this allegation says nothing about what was discussed concerning the excess inventory, how it was factored into the 2023 budget process, how Mr. Jagdfeld or the company were weighing the excess inventory issue, how they were weighing all the other factors that they took into account, for example, the historical rate at which they had been clearing some of the excess inventory. None of that is illuminated here.

The plaintiff does not make any allegation by CW3 or otherwise to demonstrate how the company and other defendants arrived at the predictions that they described to the market on May 3rd and what information they may have had and considered when doing so or what information they may have had or discarded in arriving at those predictions.

So returning, Your Honor, to plaintiff's claim. And again, this is in the very first paragraph of his opposition. He says that "deteriorating macro economic conditions" impeded -- He's talking about impeding Generac's effort to reduce the excess inventory. And then he goes on to say, and "this left the company with virtually no hope of meeting its targets for the year."

The crux of the case plaintiff then says in that same paragraph is that instead of disclosing these realties to the market, defendants kept them hidden, and again that's a quote

from the opposition in the first paragraph.

So I want to break that down a little bit because it goes directly to Your Honor's question about pleading scienter here. It also goes frankly to the falsity element as well because plaintiff must demonstrate not just with respect to scienter but also with respect to falsity that the defendants, and each of them, had some information that they failed to disclose. They were in possession of some information at the time of their statements that they failed to disclose, which rendered those statements misleading.

And so let's first talk about what is plaintiff really complaining about here? He's complaining that Generac made a prediction. That prediction was not about whether the company would be able to clear the inventory. In fact, the complaint admits that filled inventory levels were declining at the time of the May 3rd disclosure. They did decline in the first quarter of 2023, and the complaint admits that they again declined in the second quarter of 2023 even after the May 3rd disclosure. That was then discussed on May 2nd. This case is not about whether defendants were right about whether filled inventory levels would decline. They were predicting they would and, in fact, they did, and they made that prediction and they told the market this.

They made that prediction in part based on the fact that they had been clearing filled inventory. But the

predictions that the plaintiff is really complaining about is about just how quickly the filled inventory levels would decline, and the plaintiffs admit that this is his quibble with our disclosure, and I'll give you one example in paragraph 65 of the complaint.

Plaintiff points to the fact that "inventory levels were not returning to normal levels at the rate defendants" had predicted.

So on that question, plaintiff wants you to believe that this fraud, this alleged fraud was some major coverup here, and he describes and characterizes the revisions that were made and predictions that were made May 3rd and August 2nd. And he alleges two things about that that I think are, frankly, on the face misleading when portrayed to the Court.

The first he says in paragraph 3 of the amended complaint that defendants revealed that it would take "significantly more time" to clear the inventory that initially represented. That is a vast overstatement of the change in the prediction that Generac made. The complaint also goes on to say that the company would "require several additional quarters" to get to more normalized filled inventory levels.

That also is a mischaracterization of the disclosures that were made. So I want to take a moment to talk about the actual change in predictions that are at the center of this case, and I'll tie this to your questions about scienter, Your

Honor.

In November of 2022, and the complaint discusses the November 2022 disclosure before the class period even begins. What Generac disclosed is that, first of all, they expect -- indicating this is prediction of a future event -- we expect filled inventory levels to normalize "in the second half of 2023." On May 3, 2023, the disclosures at issue, again they disclose that they expected the filled inventory levels to normalize "in the second half of the year," essentially repeating the disclosure from November.

And by the way, they explained to investors the reasoning that went into maintaining this prediction, and that gets back to Your Honor's scienter point. Because what we don't see anywhere in the complaint is any allegation that that reasoning was based on a failure to consider some information that was available to defendants at the time.

Now, they've made this disclosure that they expected filled inventory levels to normalize in the second half of the year. So what did they change in their prediction on August 2nd? They said it is now expected to extend further into the second half of the year. And to be a bit more precise, they elsewhere disclosed that we anticipate they'll now normalize in the "fourth quarter of 2023."

In other words, we're not talking about significantly more time or several additional quarters as plaintiff's claim in

their complaint. We're talking about extending this timeline from the second half of the year to further into the second half of the year. And at the end of the day, that's what plaintiff is quibbling about in this case.

Though that comes back to the point that Your Honor is making. At bottom, plaintiff's theory is the defendant should have disclosed on May 3rd that filled inventory levels would not normalize until later in the second half of 2023 rather than waiting until August 2nd to make that disclosure. But the critical failing of the complaint is that there's not a single fact plead anywhere in the complaint to show that any defendant actually knew or believed on May 3rd that it would be later in the second half of 2023 that filled inventory levels would normalize.

So, for example, there's no fact plead to show that Generac secretly concluded that inventory levels would not normalize until the fourth quarter but then secretly decided to lie to investors and claim instead it would just simply be the second half of 2023. There's nothing like that in the complaint. And let me put this a little bit differently again returning to the plaintiffs -- the way plaintiff framed it in their opposition brief. His argument was that Generac hid from investors, that the company had "virtually no hope of clearing filled inventory levels in the second half of 2023."

The complaint does not plead a single fact, whether

from a confidential witness, from a report that Mr. Jagdfeld or Mr. Ragen received, from some data that they were reviewing, not a single fact that show that Generac, Mr. Jagdfeld or Mr. Ragen secretly believed in May 2023 that the company had no hope or virtually no hope of clearing filled inventory levels by the end of the year, and I do think that that is a fundamental and fatal flaw for this complaint, and it's one that the Court is correct to focus on.

Let me now turn -- I'm sorry, Your Honor, just one moment. Yes, let me now turn, Your Honor, to your question about the materiality element. Now, I want to be clear that defendants did not bring this motion on the mere basis that the alleged misstatements are immaterial. However, what we note, and there are many other reasons, Your Honor, many other reasons, you've seen these in the paper, that we believe that you cannot label these as false statements. They're protected by the PSLRA safe harbor for forward looking statements.

THE COURT: No, sorry to interrupt you. The reason I didn't ask about those is because I have fewer questions about your arguments in that regard than I do about the puffery argument.

MR. VANZURA: I appreciate that, Your Honor. I'll focus on the puffery arguments. And my only point being that that's not the only basis on which the Court may choose to dismiss this complaint on failure to plead falsity grounds.

So what the opposition argues and Your Honor is focusing on is the way in which the opposition confuses puffery with materiality. And you'll remember in our papers in our opening motion, we address each of those issues separately. And what plaintiffs have done is they've conflated the two as if to suggest that material topics can never be puffery. And Your Honor is correct that some of the statements made by the defendants on May 3rd are repeated by analysts or cited in their analyst report. But even if the subject matter of a statement is material, that statement can still be in-actionable puffery.

There's also -- What I want to also point out with respect to these statements is these are the kind of statements the Court often find are puffery because for two reasons. One, they are statements of corporate optimism. We expect and investors expect that public company executives are going to often times couch their predictions or their statements in optimistic terms. It happens all the time. Investors aren't surprised by it, and I'll point out one example that's actually cited in the complaint regarding an analyst report, and this is in complaint paragraph 33.

When JP Morgan in their report is addressing the predictions that were made on May 3rd and they point out "we believe investors may remain somewhat skeptical," they are talking about these predictions, "until we are in closer proximity to the rebound."

Now, why would JP Morgan say something like that, and why would investors be skeptical? It's because investors know that predictions are inherently uncertain and involve events that may or may not occur in the future. They likewise know that there tends to be an optimistic gloss often on corporate statements, and they take that into account.

But there's a second reason here that these are the types of statements that fall into the category of puffery even when analysts comment on them. And we cite the case law in our brief, Your Honor, on page 10 that says just because it's in an analyst report doesn't mean that it's not puffery. A statement may be puffery and may still be cited in an analyst report. Analysts cite lots of things in their reports.

But the second reason here is because the statements that were at issue here are so vague and nonspecific as to be immeasurable. If as an example Generac had said, we expect filled inventory levels to clear at a rate of ten percent in the later half of 2023, that's something that's measurable. That's something that's objective, and we can determine after the fact did they, in fact, clear at the rate of ten percent in the later half of 2023?

Here, it was we expect them to normalize. We expect to stabilize. We expect us to be able to return to year over year growth in the second half. Those are the kinds of statements that are less measurable and typically fall in these

types of securities cases into the category of more likely puffery than immeasurable, verifiable fact that can be objectively be determined to be true or false.

With that, Your Honor, I wanted to make one additional point if I may regarding the fraud theory that plaintiffs have posited here, and again I'm striving to not repeat things that are in our papers.

And our papers focus on the elements of plaintiff's two claims, the law applicable to those claims, and the application of the law to the complaint allegations. By the way, we do take those as true for purposes of our motion. Now, that's obviously an important exercise, and I firmly believe that this complaint does not pass muster under the spotlight of that exercise, but I also want to point out that we can ask the Court, and the Court has the discretion to apply common sense here.

And as described in this complaint, the fraud claim, the fraud theory, the fraud scheme that plaintiff has hit on does not make sense. It defies common sense, and I want to focus on that for just under two minutes.

So as it is described in the complaint, Generac, its CEO, and its CFO did exactly what the securities law encourage good public company citizens to do. They disclosed their expectations and gave guidance to investors about the rate at which they believed filled inventory levels would normalize and

the resulting expectations for overall future financial performance. They explained the assumptions underlying those expectations. And when those expectations were not met at the rate at which filled inventory levels were returning to normal, they then forthright came out and told investors that, hey, we missed the mark a little bit here, and they explained the reason that those expectations were not quite met.

The securities laws and the PSLRA are designed to incentivize exactly this kind of behavior by public companies and their executives without fear of being sued if their expectations turn out to be wrong. We want companies to express their guidance and give predictions to investors, and we don't want them to have to face a lawsuit every time one of those predictions turns out to be slightly off.

And that's one of the express reasons that the PSLRA imposes these heightened pleading standards that don't apply to any other kind of case, not even class actions. These are unique shareholder class actions. Let's talk with that in mind about the fraud scheme that plaintiffs are describing here.

According to the complaint, we didn't tell the whole truth on May 3rd about our expectations. And again, you're right, Your Honor, the complaint does not point out any information we had that would have suggested that we were secretly harboring different expectations. But the theory goes by defendants that we waited then three months and then just

Case 2:24-cv-00240-PP    Filed 02/12/25    Page 17 of 33    Document 42

turned around and voluntarily told the market about this whole fraud, basically admitted to it.

We said on May 3rd it's going to be X and three months later, we then told the real truth according to plaintiffs. That doesn't make any sense as a fraud scheme to just try to defraud investors and then turn around a few months later without any prompting and admit to the real truth.

There's the second reason that that doesn't make any sense, and this is highlighted in our papers when we talk about scienter and particularly about the individual defendants' stock sales or lack thereof. What would be the purpose for such a scheme? Mr. Jagdfeld has been with Generac for more than 30 years. He's been CEO for nearly 18 years. Mr. Ragen has been with Generac for almost 20 years, and he has been CFO for more than 16 years.

So to accept plaintiff's theory, the Court would have to believe that they both put their reputations, their long tenures on the line, conspired to hatch this fraudulent scheme and invite this lawsuit. And plaintiff's only two theories are they did it to sell stock, number one. Well, we've already dealt with that in the papers. Mr. Ragen didn't sell any stock, and Mr. Jagdfeld sold stock only pursuant to a 10b5-1 plan and in accordance with his past sales.

Now, plaintiff by the way in their opposition, all they do in response to that is they repeat the allegations of

the complaint. They don't actually meet the case law or the arguments that were made there.

But the second motive that they touch on is that Mr. Jagdfeld and Mr. Ragen wanted to "temporarily" they wanted to "protect the value of their equity grants." That doesn't make any sense.

Like the stock sale allegations as a matter of law, those are not sufficient to plead scienter in the first instance. But the common sense point here is the argument that they wanted to temporarily delay a loss in value to their equity grants doesn't make sense. If the value is going to go down had they told the whole truth on May 3rd, the value is going to go down when they told the whole truth on August 2nd. Temporarily delaying that decline in value accomplishes nothing, absolutely nothing for either gentleman. It's a nonsensical motive allegation.

So we're right back to where we started, how this is a fraud scheme to keep something secret for just three months accomplishes anything and for what purpose would they have engaged in it?

So we started with scienter. I want to end with scienter because I do think that that is a basis on which the Court should dismiss the complaint. I'm available to answer any other questions the Court may have, and I thank you for the time.

THE COURT: Thank you, Mr. Vanzura. I appreciate the argument. And the only one question I have, I do understand your position that, you know, scienter is kind of the live and die hill. And if there is no scienter, we don't need to worry about puffery or materiality. As somebody who deals in a universe where I am frequently forced to ask people are you saying that it's a rule of law that, I wanted to ask you one question.

You talked about the fact and you gave a specific example that -- that one of the statements that Mr. Jagdfeld or Mr. Ragen could have made was to say, okay, by X date, we're going to reduce the field inventory by ten percent. Or okay, we're going to reduce the field inventory by 100,000 units or, you know, something very specific and very measurable that people could have come back and said, okay, well now is the target date, and you're not down ten percent or you're not down 150,000 units.

I don't think I'm hearing you argue, but I just want to make sure, you're not saying that there's a case out there in the Seventh Circuit or a case that would be binding that says if there's not a specific measurable figure, that's not the word I'm looking for. But if there's not a specific measurable component to the statement, that it's always going to be puffery. You're not making that broad an argument, are you?

MR. VANZURA: You're correct, Your Honor. I'm not

making that broad of an argument. What I am saying though is that often times when courts examine these kinds of statements to determine whether they are in-actionable puffery, one of the factors they often weigh is whether it's an objectively measurable or verifiable fact versus a vague expression of some future event, in this case a future event, but some vague expression on which no reasonable investor could entirely rely.

That's all I'm saying, it's a factor the Court can consider when speaking to determine whether it constitutes corporate puffery, but there is not a bright-line rule of which I'm aware that says absent an objective fact, it cannot be -- It must be puffery.

THE COURT: Okay. That's -- You just got to what I was -- I'm not familiar with any such law either, at least not in this circuit, and I just wanted to make sure that I was not hearing you say that. My sense of the circuit law is that it is bit of a wiz or why, I'll know it when I see it kind of thing, and you can have a statement that doesn't have any measurable specifics in it that nonetheless is not puffery for other reasons, so I was just trying to clarify that, so thank you. I heard you the way I thought I heard you, and I just wanted to make sure.

MR. VANZURA: You did, Your Honor. If I could just point out in our motion at pages 22 to 23, we identify a number of cases where the courts have examined statements similar to

what were made here and determined that they are -- determined that they are in-actionable puffery. My colleague is pointing out that there is one case that the Court might consider. It's the *Conagra* case that we cited in our papers.

THE COURT: Yeah.

MR. VANZURA: And at page 652 in that case, they did find statements in-actionable where they did not have enough specificity to allow for objective verification. That's the kind of application of that principle that I was describing.

THE COURT: Yeah, I know. I've got a number of notes with regard to, you know, some of the language that was used. One common word that was used in the May 3rd statements over and over and over again is normalize, normalize, normalize levels which, you know, what is that? I don't know -- I don't know what that is, so I understand your point.

I just wanted to make sure that I understood the broader legal principle that you were stating, and I think I understand it correctly, so thank you for that.

MR. VANZURA: Thank you, Your Honor.

THE COURT: All right. So now Mr. Apton, I will turn to you.

MR. APTON: Good morning, Your Honor. Adam Apton here for plaintiff. To answer Your Honor's first question about materiality. The analyst, especially from Top Tier Investment Banks, more certainly serve as a proxy for what's important in

the market. Here, based on the analyst reports that we quoted in our complaint, it's clear that the analyst and market and investors, everyone involved, were laser focused on Generac's inventory levels. This includes leading into the class period.

Paragraphs 30, 32, 33, 35 to 37 provide examples of just how focused analysts were on inventory levels and their return to normal, which was in some ways quantified by defendants. Throughout the class period, defendants would indicate that they were 1.4X or 1.5X, and that they were returning to 1.2X, 1.3X, so on and so forth.

Following the class period, analysts were still certainly focused on the inventory levels. Paragraphs 57 and 58 show that the market was certainly say surprised when Generac revealed that it would take longer to return to normal inventory levels. I don't think there's any real basis, especially at the motion to dismiss stage, to hold that the statements were immaterial as a matter of law.

To move on to scienter, Your Honor. I appreciate the question and do we have a direct report given to Jagdfeld or Ragen? No, we don't. This is, in part, because the production reports didn't exist at that time, so we must rely on the circumstantial evidence which here, under the case law, definitely gives rise to a strong, cogent and compelling inference of scienter.

Core operations is thrown around a lot and sometimes

Case 2:24-cv-00240-PP   Filed 02/12/25   Page 23 of 33   Document 42

it's used when it shouldn't be. Here we know that the home stand-by generators were one of Generac's historically most important products, even more important leading into the class period given what happened with the solar products. It was not as successful as they liked Generac would have hoped, which created more importance and need for the home stand-by generators to fill that void or to make up for that -- that -- those losses.

MR. FENN: Your Honor, I apologize. This is Matt Fenn from Mayer Brown. I think my Houston and LA colleagues got cut off from the phone call. They were going to try to dial in again. They can't hear anything.

THE COURT: Okay. Thank you. Go ahead, Mr. Apton.

MR. APTON: Thank you, Your Honor. The core operations doctrine, *Tellabs, Inc.*, which I believe is when the Seventh Circuit received it back from the Supreme Court on remand shows how that core operations inference or theory applied to the facts here. *Sears, Roebuck* as well as the cases we cite in footnote 7, which is on page 21 of our brief, all show just how the core operations doctrine would be applied in this case given the importance of the home stand-by generators to Generac.

We're not just relying on cooperations. The company, Jagdfeld and Ragen, were acutely focused on inventory levels. This is demonstrated not just by the questions they received

24

from analysts during conference calls, but also by defendants' statements.

In paragraphs 69 to 72 of our complaint, we feature those statements. We have I guess what you could say is statements from the defendants. Jagdfeld, for example, saying that Generac tracks "a lot of data down to the zip code level in areas." That was in August of 2022.

In November of 2022, Ragen says that Generac started "tracking the metric" of home consultations and sales leads in 2013, so they've been doing this for quite some time.

On August 2nd of 2023, so at the end of the class period, Jagdfeld says, "we do our own channel checks. We know what field inventory looks like with -- Sorry, let me repeat that. On August 2, 2023, Jagdfeld says, "we do our own channel checks, and we know what field inventory looks like really with a high degree of accuracy region to region and dealer to dealer, wholesaler to wholesaler, retailer to retailer."

THE COURT: Can I just interrupt there? I'm sorry, Mr. Apton. I agree with all that, but that goes to tracking the state of inventory at the moment, not to predicting what will happen to the inventory going forward.

MR. APTON: True. But the reason -- Part of the reason the statements in May were misleading is because the progress they had made up until that date was not as they depicted to the public. They were not lowering their inventory

levels because they were producing inventory at an incoming rate of demand, so there was no clearing of the excess inventory that existed to that point.

Defendants knew. I mean look, we asked CW3 who you're right, Your Honor, was not in the meeting with Jagdfeld but says it was exceeding -- I forget the exact words. It is very likely or he would have or would have been featured in the meeting between Jagdfeld and his supervisor. But beyond that, we have facts that give rise to a very strong inference that these individual defendants surely would have known inventory levels at the time of May 2023. And prior to that, meaning that they knew inventory was not clearing at the rate that they claimed it was.

THE COURT: I interrupted you. Go ahead.

MR. APTON: Well, that's to my point, Your Honor. So with those facts in the background and given rise to that inference of actual knowledge, common sense would allow for that fact to be or that conclusion to be accepted as true for the purposes of the pleading at this point.

It's not fair for defendants to fault us for not pointing to an internal document saying what defendants knew exactly when they knew it and, you know, chapter and verse with specific decimal points. That's not what's required of us at this point in time especially if, in part, some of those reports didn't even exist until the start of the class period.

26

THE COURT: Thank you, Mr. Apton. Can I also ask you to address or may I also ask you to address at the end of his argument, Mr. Vanzura kind of made a broad, general argument that the fraud scheme that your client has described kind of doesn't make a whole lot of sense given the disclosure three months later in August, and I wondered if you could comment on that.

MR. APTON: Sure. Your Honor, first of all, there's no bright-line rule on how long a class period must be. Some class periods are much shorter than the one we have here. Some are much longer. We do know as alleged, for example, in paragraph 2 that Generac had been in a state of decline, its stock price business, for many years. There was surely a growing level of pressure that the CEO and CFO were facing.

And so if in a moment of poor judgment or recklessness they said, let's delay the bad news in anticipation that good news will outpace it, that is certainly fraud. That is the -- The theory of fraud that was described in the *Tellabs* decision. Speaking untruthfully in hopes that, you know, they will be able to generate good results before having to divulge the bad news, that is very much fraud.

So even if there was no extreme stock sales in the moment, that's okay. That doesn't prevent us from pleading or stating a claim under the Exchange Act. That's exactly what we have here. We have a documentation showing that analysts, the

27

market in general, were hyper focused on Generac's inventory levels. We have a relatively recent history of Generac just getting hammered in the stock market. And what did these two defendants do? They sat on bad news hoping that there was going to, perhaps, be some hurricanes or something to -- to juice the market in order to allow them in hopes of miraculously clearing excessive inventory virtually overnight. When that didn't happen, they decided to come clean, and they did. When they did, stock price dropped 25 percent in one day.

THE COURT: Okay. Thank you, Mr. Apton. And then finally, Mr. Vanzura, I'll give you a few minutes for the last words.

MR. VANZURA: I appreciate that, Your Honor. Glenn Vanzura again for the defendants. I'll be very brief. I want to address particularly Mr. Apton's point. He said two things that were related. He said what was actually happening in reality, what we failed to disclose, is that Generac, "was not lowering their inventory levels," and he separately said that we were "not clearing at the rate that we said it was going to clear."

Now, that is factually untrue, and I say that based on the allegations in the complaint. The complaint at paragraph 53 points out our disclosure in August of 2023 saying that the company continued to make progress in reducing field inventory levels. Those levels were being reduced in Q2 of 2023.

Earlier on May 3, 2023, and this is in paragraph 62 of the complaint, the disclosures did fill inventory levels of home stand-by generators declined at a rate consistent with our expectations in the quarter. So what the complaint describes is predictions being made by Generac about the future clearance and describing, in part, is based on their historical experience. The levels were declining in Q1. They were declining in Q2.

There is no allegation anywhere in the complaint to suggest that, one, those statements were false though plaintiffs were effectively conceding they were, in fact, clearing filled inventory levels despite what Mr. Apton said a few moments ago. And two, there's nothing plead in the complaint to suggest that defendants somehow intentionally factored in those rates of decline into their predictions, came up with a conclusion that they couldn't possibly meet those expectations by the end of the year and yet nonetheless decided to go to the market and lie to them about what their expectations really were. There's no report. There's no data. There's no -- In fact, there's no allegation whatsoever about how the defendants weighed this information in any reason that they should have disclosed something different on May 3rd than what they disclosed, which were their expectations at that time.

So I think Your Honor's exactly right on this point, and I haven't heard anything from Mr. Apton that would suggest again that there was any information that the defendants

29

actually had and that they did not use or that they misused in arriving at their future predictions that they then expressed to the market.

THE COURT: Now, Mr. Apton says there were inferences to be drawn however. He says, of course, there weren't any actual reports because you all weren't even making them at that time, but there were circumstances that gave rise to strong inferences.

MR. VANZURA: There are two points on that, Your Honor, and I appreciate the opportunity to speak on it. The first is yes, as Your Honor noted at the very end there, it is not just differences. It must be a strong inference. The PSLRA requires that. The PSLRA also requires plaintiffs to plead specific facts, not just to make leaps or speculative conclusions.

All I've heard from Mr. Apton so far is speculation about why the defendants might have done this, what they might have known, et cetera. No specific facts whatsoever. I gave examples as we see in most of the cases that we cited of specific reports, et cetera. But very specific facts at the very least must be plead. And, for example, the *Friedman* case, which we cited in our opening brief at page 18, and that's page 901 of that opinion, points out that statements are not actionable unless the plaintiff offered particularized facts showing the defendants knew information that they were providing

was wrong at that time. And we don't see those kind of facts, the kinds of facts that courts find sufficient to adequately plead scienter or in these kind of cases falsity.

THE COURT: Okay. Well, thank you all for your very detailed and helpful argument this morning. And thank you for being willing to tailor your arguments to the particular issues. I'm sure there was much more that you might have wanted to say, but these were the two things that I was most interested in getting some information about, and I appreciate both of you providing it.

I hope to get a decision out to you as soon as possible. I want to factor in a little bit of what you've talked about today and look a little bit more deeply into a couple of things you said, but I know we need to get something out relatively quickly, so I'm hoping to get something out in a week or so.

But in the meantime, thank you for the time you've taken today and for the work you've done preparing and giving me some detailed answers. So with that, Mr. Apton, Mr. Frank, anything else you all can think of that we need to try to take care of this morning?

MR. APTON: No, Your Honor, not from plaintiffs. Thank you. Thank you for this.

THE COURT: Sure.

MR. FRANK: Thank you, Judge.

31

THE COURT: Mr. Vanzura, Ms. Vallette, anything else you can think of that we should try to take care of this morning?

MR. VANZURA: No, Your Honor. Just thank you for your time and for giving us the opportunity to be heard.

THE COURT: Thank you all. Take care. Enjoy the rest of your day.

(Whereupon proceeding was concluded.)

C E R T I F I C A T E

I, SUSAN ARMBRUSTER, RMR, FCRR, Official Court Reporter and Transcriptionist for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.

Signed and Certified February 12, 2025.

/s/Susan Armbruster

Susan Armbruster

Susan Armbruster, RPR, RMR, FCRR
United States Official Reporter
517 E Wisconsin Ave., Rm 200A,
Milwaukee, WI 53202
Susan_Armbruster@wied.uscourts.gov