UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHRISTOPHER WALLING,

        Plaintiff,

                                    Case No. 24-cv-240-pp

    v.

GENERAC HOLDINGS, INC.,
AARON P. JAGDFELD and YORK A. RAGEN,

        Defendants.

**ORDER GRANTING DEFENDANT'S MOTION FOR CONSIDERATION (DKT. NO. 33), GRANTING DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT (DKT. NO. 30) AND DISMISSING CASE**

On April 22, 2024, the plaintiff filed an amended complaint in this putative shareholder class action, alleging that the defendants had violated the Securities Exchange Act of 1934 (the "Exchange Act") "by failing to disclose pertinent information relevant to the Company, or, alternatively providing information about the Company which was misleading or deceptive." Dkt. No. 25 at ¶1. On June 21, 2024, the defendants filed a motion to dismiss the amended complaint, dkt. no. 30, and a motion asking the court to consider documents under the incorporation-by-reference doctrine or by judicial notice, dkt. no. 33. The defendants argue that the court must dismiss the amended complaint because it fails to satisfy the pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA")—specifically, the falsity and scienter requirements. Dkt. No. 31 at 9-10. On February 4, 2025, the

1

court heard oral argument on the motion. Dkt. No. 41. And on August 25, 2025, the plaintiff provided the court with two additional cases that he says support his arguments. Dkt. No. 43.

Because the plaintiff has failed to allege a strong inference of scienter, the court will grant the defendants' motion to dismiss.

## I. The Amended Complaint (Dkt. No. 25)

The amended complaint asserts that "[t]his is a federal securities class action on behalf of all persons who purchased Generac stock between May 3, 2023 and August 1, 2023, inclusive (the 'Class Period')[.]" Dkt. No. 25 at ¶1. It explains that Generac is a corporation "historically known for its home standby generator [(HSB generator)] business, which entails the manufacturing, distribution, and sale of electric generators for residential use." Id. at ¶2. It says that "Defendant Aaron P. Jagdfeld was at all relevant times Generac's President and CEO." Id. at ¶12. It alleges that "Defendant York A. Ragen was at all relevant times Generac's Executive Vice President, Chief Financial Officer, and Chief Accounting Officer." Id. at ¶13.

The amended complaint alleges that "[i]n late-2019, [Generac] expanded its operations to solar energy-related products to generate additional revenue and appeal to investors," but that "Generac encountered significant difficulties with its business following its expansion to solar energy." Id. at ¶¶23-24. It asserts that "[t]hese operational challenges created pressure on Generac's legacy home standby generator business to succeed; [h]owever, Generac's generator business was also facing problems." Id. at ¶26. The amended

2

complaint avers that "[d]uring the Covid-19 pandemic, various states and municipalities issued 'shelter-in-place' orders in 2020 which led to a surge in homeowner demand for generators." Id. It alleges that, "[t]o service the increase in demand, Generac attempted to increase production and recruit more local dealers (which Generac used as part of its distribution process in addition to retail stores and wholesalers)." Id. According to the amended complaint, Generac did not increase production and distribution quickly enough, which allegedly resulted in elevated lead times (the time between receipt of an order and shipment or installation of an HSB unit), lower close rates (finalized sales) and lost customers. Id. at ¶27. The amended complaint asserts that "[b]y mid-2021, Generac's lead times were negatively impacting demand," and that "[d]espite the weakening demand, dealers continued ordering generators even without homeowners to sell them to." Id. at ¶¶27-28. It alleges that "production and demand were moving in different directions with the former increasing and the latter decreasing." Id. at ¶28.

The amended complaint contends that "Defendants were aware of the growing divergence between production (*i.e.*, inventory) and demand (*i.e.*, sales) heading into the Class Period." Id. at ¶29. It alleges that in November 2022, Generac's president and CEO Jagdfeld admitted during an earnings conference call and in a Wall Street Journal article that, "'we knew' there was a 'negative impact on close rates,' '[w]e ramped up our production beyond what the installers could handle,' and dealers' inventory got so high with uninstalled products that they 'physically started to run out of room, run out of credit.'" Id.

The amended complaint avers that "[o]n February 15, 2023, Generac held an investor conference call to discuss its results for the fourth quarter of 2022," during which Generac "told investors that residential product sales had declined at a double-digit rate as compared to the prior year." Id. at ¶31. According to the amended complaint, "Generac attributed the decline to fewer shipments of home standby generators resulting from higher field inventory levels; with excess inventory already in its distribution channels, fewer orders needed to be placed with Generac which in turn resulted in less shipments." Id. The amended complaint goes on to assert that Generac nonetheless told investors "that the first quarter of 2023 would 'mark the trough' during the 'current channel destocking process' and that 'field inventory levels' would return to normal levels after the second quarter of 2023." Id.

The putative class period begins on May 3, 2023—the day Generac held a conference call and released a press release regarding its results for the first quarter of 2023. Id. at ¶¶1, 34, 60-64. The amended complaint alleges that during the conference call and in the press release, the defendants made statements that "were false and/or materially misleading because they represented that inventory levels would return to 'normal' after the second quarter of 2023 and, in turn, supported the 2023 outlook Generac had previously provided investors." Id. at ¶65. The amended complaint asserts, "[i]n truth, inventory levels were not returning to normal levels at the rate Defendants represented and, in fact, did not support Generac's previously issued 2023 outlook." Id. The amended complaint quoted large portions of the

4

press release and the conference call but emphasized twelve particular statements. See Id. at ¶¶60-64. From the press release, the amended complaint highlighted the following:

- In addition, residential product sales in the current year quarter were impacted by elevated levels of field inventory for home standby generators and a decline in clean energy products as we continue to expand our distribution network. However, power outage activity in the quarter was well above the long-term average, helping drive significant year-over-year growth for home standby in-home consultations and *a meaningful reduction in field inventory levels for these products.*

- Due to ongoing strength in leading indicators of demand for home standby generators and significant backlog for C&I products, the Company is maintaining its full-year 2023 net sales guidance. *Consistent with the prior outlook, shipments of residential products are still expected to remain soft during the second quarter as home standby field inventory levels continue to normalize, with a return to year-over-year sales growth in the second half of the year partially offsetting the expected first half decline.* In addition, our outlook for C&I product sales to grow at a mid to high-single digit rate during the year remains unchanged. Accordingly, the Company continues to expect full-year net sales to decline between -6 to -10% as compared to the prior year, which includes approximately 1 to 2% of net favorable impact from acquisitions and foreign currency.

Id. at ¶60 (emphasis in original). From Jagdfeld's opening statement during the conference call, the amended complaint highlighted the following:

- Adjusted EBITDA [earnings before interest, taxes, depreciation and amortization] margins were also better than expected due to favorable price/cost dynamics. Additionally, *field inventory levels of home standby generators declined at a rate consistent with our expectations in the quarter.*

- *The number of home standby generators in field inventory continued to decline towards more normalized levels during the first quarter, with the number of units falling meaningfully and ending the quarter approximately in line with our prior*

5

*expectations.* Days of field inventory relative to historical norms also decreased sequentially in the quarter but remained elevated.

- We expect field inventory to decline further in the second quarter, resulting in another quarter of lower home standby orders and shipments relative to the higher end market demand *before returning to more normalized levels as we enter the second half of the year.*

- We believe these solutions, as well as continuing to expand overall distribution, could further increase Generac's competitive advantage given our unparalleled scale, focus and expertise in the home standby market. Consistent with the comments provided on our fourth quarter earnings call in mid-February, we expect that *the first quarter marked the trough for home standby shipments in the current channel destocking process.*

- *We continue to anticipate a return to year-over-year sales growth in the second half of the year as field inventory returns to more normalized levels.* The above-average outage environment and robust growth in home consultations thus far in 2023 further support this expectation.

- In closing this morning, *we believe our first quarter performance represents a trough in the current cycle as we continue to focus on reducing home standby field inventory levels* and as we work to rebuild sales momentum for our power cell residential energy storage systems. That said, we're extremely pleased with the continued execution in our global C&I product categories that drove overall results ahead of our prior expectations, and we're encouraged by the progress we're making in addressing the near-term challenges that are impacting our residential product categories.

Id. at ¶62 (emphasis in original). From CFO Ragen's opening statement during the conference call, the amended complaint highlighted the following:

- With that, I will now provide further comments on our outlook for 2023. As disclosed in our press release this morning, we are maintaining our prior outlook for the full year 2023. *We continue to expect the residential product category will be impacted by higher home standby field inventory levels in the second quarter before returning to year-over-year sales growth in the second half*

6

*of the year,* resulting in a full year decline in the high-teens range compared to the prior year.

Id. at ¶63 (emphasis in original). From President/CEO Jagdfeld's response to questions during the conference call, the amended complaint highlighted the following:

- So I would just say that Q1, artificially low relative to what home standby shipments could have been had we been matching kind of the shipping pace with the demand pace, right? So we were out of step with that because of the field inventory challenges that we've talked much about here. *So you put those together, and those we're pacing to have that abate as we enter the second half of the year. We think that, that's something that's going to improve. As we said, we're going to get back to more normal levels there. So we return to more normal levels there.*

- I think on the field inventory, the way we described it, it was a meaningful decrease in the raw inventory numbers there. And I think there's really—the big thing to look at, and we've mentioned this before, the days of field inventory, right? So we mentioned, I think in the third quarter of last year, we were about double where we thought we needed to be, right? That was kind of—and we made progress down to about 1.7x when we got to kind of the Q4 call here in February. *Now we think that range is somewhere in the 1.4 to 1.5x kind of "normal", right? There's some debate about what normal means, but we're looking at our history in the categories and we're making good progress. It's all in line.*

- Yes, *we are seeing a return to growth starting in the third quarter.* So that is the expectation and the way we got the guidance around residential. More specifically to the commentary about home consultations being very broad-based, right, almost all states, I think what was really encouraging again in this, this is what I think is different from kind of the pre-pandemic period to today. And as you may recall, we mentioned that just consultations in general up dramatically from that pre-pandemic period, almost—really more than 4x off of that base. And I think when you step back and you look at that kind of pre-pandemic to today, it is the broad-based nature of that growth that's really encouraging for us.

Id. at ¶64 (emphasis in original).

7

The amended complaint summarized all this: "Defendants told the market that the worst of their excess inventory problems was behind them, claiming that the 'first quarter marked the trough for home standby shipments in the current channel destocking process;'" while, "[i]n truth, Defendants' excess inventory problems were continuing and were not abating at the rates they claimed publicly." Id. at ¶67. The plaintiff contends that "[w]ith continued excess production and lagging close rates due to worsening macroeconomic conditions, Defendants' descriptions of the 'destocking process' were false and/or materially misleading." Id.

The amended complaint alleges that contrary to their public statements, the defendants were not lowering inventory levels and were not tracking for a return to normal sales. To support this contention, the amended complaint relies on statements from CW1, Generac's former Operations Financial Analyst from September 2022 to March 2023. Id. at ¶¶40-44. The amended complaint alleges that "[p]roduction reports (which set forth what each plant was supposed to produce in a month compared to what it actually produced) did not exist prior to 2023 and, importantly, at the time Defendants initially set the 2023 outlook in November 2022." Id. at ¶76. According to the amended complaint, in November 2022 CW1 was tasked with developing these production reports to, among other things, implement a process by which Generac could accurately determine how many generators needed to be produced in light of inventory already on hand and already in the field. Id. at ¶42. The amended complaint asserts that "[p]rior to the production reports,

8

there was no form of consistent inventory reporting; instead, each group had its own method for reporting inventory and supply." Id. at ¶41. The amended complaint alleges that, "[p]rior to CW1's 'supply schedule' project[], Generac did not have the production information necessary to effectively set production rates and, consequently, lacked the ability to determine how much inventory it was adding to existing levels of field inventory around the country and how long it would take to clear." Id. at ¶76.

The amended complaint alleges that despite the defendants' downplaying the effects of the economy, deteriorating macroeconomic conditions further prevented Generac from clearing excess inventory. See id. at ¶¶35, 49-50, 71. It asserts that CW3—Generac's former Account Manager from June 2019 to August 2023—recalled hearing from Generac's channel partners that "shelves were full, and demand was slowing," and as a result, by the fourth quarter of 2022, customers were left "sitting on tons of inventory." Id. at ¶¶48, 50. The amended complaint alleges that, to "get product out the door," Generac began "cutting deals" with these customers, including offering to sell its HSB units at lower prices and offering extended payment terms. Id. at ¶¶50-51. The amended complaint claims that these efforts were unsuccessful and that as a result, Generac already was "seeing a slow-down" in orders from its channel partners during the fourth quarter of 2022. Id. at ¶51. CW3 recounted that Generac had offered rebates, but that accounts began to "put on the brakes" as to new orders because inventory was "not selling." Id. at ¶¶51-52. CW3 opined

9

that by the end of 2022, Jagdfeld unquestionably knew about the excess inventory. Id. at ¶52.

The amended complaint also recounts how CW2—Generac's former Plant Controller in Trenton, SC from April 2022 to May 2023—described the accumulation of inventory during the fourth quarter of 2022 and into 2023, as customers cancelled orders with Generac "because of concerns about interest rates and increasing prices." Id. at ¶¶45-47. The amended complaint asserts that rather than clearing inventory (as the defendants were reporting), Generac continued producing and housing excessive levels of inventory without delivering products to dealers and/or customers. Id. at ¶¶43, 46-47.

The amended complaint asserts that the defendants' May 3rd statements about Generac's inventory and market demand came at an important juncture because Generac's stock had been on a steady decline. Id. at ¶¶2, 80. The amended complaint alleges that the defendants' positive statements about Generac's progress toward normalizing inventory and sales levels prompted an outsized effect on its stock price, increasing share prices by 11% in a single trading day. Id. at ¶¶38, 77-80. The complaint contends that consequently, when the defendants revealed the excess field inventory problem would persist past the second quarter and throughout the remainder of the year, the market reacted sharply in the opposite direction. Id. at ¶¶53-59, 87-90. The amended complaint recounts that on August 2, 2023, Generac revealed that its second quarter 2023 residential product sales were lower than prior expectations due to "softer consumer environment for home improvement," which in turn

10

"impacted shipments of home standby generators." ¶¶4, 53. The amended complaint states that later that same day, Jagdfeld and Ragen disclosed that the decline in consumer demand impeded Generac's ability to "drain the inventory." Id. at ¶¶54-56. According to the amended complaint, the defendants stated that inventory "normalization" now was expected to "extend further into the second half of the year . . . with the return to year-over-year growth in home standby shipments now anticipated in the fourth quarter." Id. The amended complaint alleges that following this news, Generac's stock price fell nearly 25%, or $37.33 per share, closing at $115.95 per share on August 2, 2023. Id. at ¶¶4, 59.

The amended complaint alleges that at all relevant times the defendants acted with scienter. Id. at ¶68. To support this allegation, the amended complaint asserts that (1) the defendants knew excess field inventory was not clearing, id. at ¶¶69-74; (2) the defendants lacked reliable internal reporting concerning production, id. at ¶¶75-76; (3) the defendants' statements prompted an abnormal rise in Generac's stock price, id. at ¶¶77-82; and (4) Jagdfeld and Ragen controlled Generac's public messaging, id. at ¶¶83-86.

The amended complaint asserts two causes of action. First, it alleges that the defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by, during the Class Period, "disseminat[ing] or approv[ing] the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading." Id. at ¶96. Second, the amended complaint asserts that by reason of their controlling positions with Generac, Jagdfeld and Ragen violated Section 20(a) of the Exchange Act because they "had the power and authority to cause Generac to engage in the wrongful conduct complained of herein." Id. at ¶101. The plaintiff seeks declaratory relief, compensatory damages, costs and fees. Id. at pages 41-42.

## II.    Motion to Consider Documents (Dkt. No. 33)

On June 21, 2024, the defendants filed a document titled "Defendants' Motion to Consider Documents Under the Incorporation-By-Reference Doctrine or By Judicial Notice." Dkt. No. 33. In their brief in support of the motion, the defendants ask the court to consider the exhibits attached to the declaration of Jacqueline M. Vallette in support of their motion to dismiss the amended complaint. Dkt. No. 34 at 2. The defendants state that the exhibits are true and correct copies of a periodic financial report that Generac filed with the SEC (Exhibit 1), transcripts of Generac earnings calls (Exhibits 2, 3 and 5), a Generac press release (Exhibit 4), an analyst report (Exhibit 6) and Jagdfeld's Form 4s as filed with the SEC (Exhibits 7, 8, 9, 10 and 11). Dkt. No. 32. Because the plaintiff did not file a brief opposing the defendants' motion to consider documents and the court has no reason to doubt the authenticity of the documents, the court only briefly addresses its reasons for granting the defendants' motion. See Civil Local Rule 7(b) (E.D. Wis.) ("Failure to respond to [a] motion may result in the Court deciding the motion without further input from the parties.").

As the defendants observe, the amended complaint references Exhibits 3-9 and they are central to the plaintiff's claims, so the court will consider them under the incorporation-by reference doctrine. See Fin. Fiduciaries, LLC v. Gannett Co., 46 F.4th 654, 663 (7th Cir. 2022) ("a court may consider documents that are (1) referenced in the plaintiff's complaint, (2) concededly authentic, and (3) central to the plaintiff's claim"; "[t]his incorporation-by-reference doctrine prevents a plaintiff from avoiding dismissal by omitting facts or documents that undermine his case"). The court will take judicial notice of Exhibits 1, 2, 10 and 11 because they are public records. See Fed. R. Evid. 201(b) and (c)(1); Patten v. N. Tr. Co., 703 F. Supp. 2d 799, 803 (N.D. Ill. 2010) ("The court takes judicial notice of matters of public record, such as stock prices and SEC filings." (citing Gen. Elec. Cap. Corp. v. Lease Resol. Corp., 128 F.3d 1074, 1080 (7th Cir. 1997); College Ret. Equities Fund v. The Boeing Co., Case No. 22 CV 3845, 2023 WL 6065260, at *3 n.1 (N.D. Ill. Sept. 18, 2023) (taking judicial notice of an SEC filing because it is a matter of public record, its authenticity has not been challenged, its existence is not subject to reasonable dispute, and its accuracy cannot be reasonably questioned).

The court grants the defendants' motion to consider documents. Dkt. No. 33.

## III. Defendants' Motion to Dismiss the Amended Complaint (Dkt. No. 30)

The defendants cite Fed. R. Civ. P. 9(b) and 12(b)(6) in arguing that the court should dismiss the amended complaint. Dkt. No. 30. The defendants argue that dismissal is warranted under Rule 12(b)(6) because the amended

13

complaint fails to state a claim; specifically, they argue that the amended complaint does not meet Rule 9(b)'s heightened pleading standard for fraud allegations and the requirements of §10(b) of the PSLRA regarding the identification of allegedly misleading statements and the scienter requirement.

A.    Legal Standards

Federal Rule of Civil Procedure 12(b)(6) allows a party to assert by motion that the complaint fails to state a claim upon which a federal court can grant relief. "A Rule 12(b)(6) motion tests 'the legal sufficiency of the complaint,' as measured against the standards of Rule 8(a)." Gunn v. Cont'l Cas. Co., 968 F.3d 802, 806 (7th Cir. 2020) (quoting Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind., 786 F.3d 510, 526 (7th Cir. 2015)). A complaint need not include detailed factual allegations, but it must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). In ruling on a Rule 12(b)(6) motion, the court "accept[s] all well-pleaded facts as true and draw[s] reasonable inferences in the plaintiffs' favor." Roberts v. City of Chicago, 817 F.3d 561, 564 (7th Cir. 2016). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" so "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

14

The plaintiff's first claim arises under §10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) and SEC Rule 10b–5, 17 C.F.R. §240.10b–5. See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, 552 U.S. 148, 157 (2008) ("Rule 10b–5 encompasses only conduct already prohibited by § 10(b)."). It alleges fraud, "and the rules of procedure require particularized pleading in fraud cases." Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp., 266 F. Supp. 3d 1154, 1157–58 (E.D. Wis. 2017), aff'd, 895 F.3d 933 (7th Cir. 2018). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); see also DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) (Rule 9 requires a plaintiff to set forth "the who, what, when, where, and how" of the alleged fraud).

Section 10(b) and Rule 10b–5 claims are subject to the even more stringent pleading requirements of the PSLRA. See Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 308 (2007) ("As a check against abusive litigation in private securities fraud actions, the . . . PSLRA includes exacting pleading requirements."). Under the PSLRA's heightened pleading standards, "a private securities complaint alleging that the defendant made a false or misleading statement must (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading'; and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Tellabs, 551 U.S. at 321 (quoting 15 U.S.C. §78u–4(b)(1) and (b)(2)). To establish liability under §10(b) and Rule

15

10b–5, a plaintiff must prove that the defendant (1) made a misstatement or omission; (2) of material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which the plaintiff relied; and (6) that reliance proximately caused the plaintiff's injury. See Stoneridge Inv. Partners, 552 U.S. at 157.

The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). See also In re Harley-Davidson, Inc. Sec. Litig., 660 F. Supp. 2d 969, 983 (E.D. Wis. 2009) ("The PSLRA requires a plaintiff to first identify each false or misleading statement—that is, the plaintiff must identify statements or omissions that are demonstrably capable of being true or false, as well as the speaker, location, and time the statement was made."). "[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor: the inquiry . . . is objective." Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 186-87 (2015). "In determining whether a statement is misleading, the Court consider[s] the context in which the statement was made and must determine whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." Rubinstein v. Gonzalez, 241 F. Supp. 3d 841, 851–52 (N.D. Ill. 2017) (internal quotation marks omitted). "Even a statement which is literally true, if susceptible to quite another interpretation

16

by a reasonable investor, may properly be considered misleading." Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc., 778 F. Supp. 2d 858, 878 (N.D. Ill. 2011).

The PSLRA states that a complaint alleging securities fraud must "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u–4(b)(2). "The 'required state of mind' in a § 10(b) case is scienter, which means 'knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false.'" Pugh v. Trib. Co., 521 F.3d 686, 693 (7th Cir. 2008) (quoting Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 756 (7th Cir. 2007)). The Supreme Court has directed courts to dismiss a securities complaint unless "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. The court "must weigh the strength of the plaintiffs' inferences in comparison to plausible nonculpable explanations for the defendants' conduct." Pugh, 521 F.3d at 693.

The complaint's second claim arises under §20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t(a). Section 20(a) states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person[.]" 15 U.S.C. §78t(a). "Thus, to state a claim under §20(a), a plaintiff must first

17

adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b–5." <u>Pugh</u>, 521 F.3d at 693.

B.     <u>Scienter</u>

The defendants argue that the amended complaint fails to allege particularized facts giving rise to a strong inference of scienter. Dkt. No. 31 at 30-37. Specifically, the defendants contend that (1) "[t]he Complaint fails to plead actual knowledge;" (2) "motive-and-opportunity allegations are insufficient to plead scienter;" (3) "[a]llegations about the Individual Defendants' positions, access to information, and 'core operations' are insufficient to plead scienter;" (4) "[i]nsider stock sales are insufficient to plead scienter;" and (5) "[t]he Complaint fails to plead an inference of scienter that is sufficiently cogent." <u>Id.</u>

1.     *The Parties' Arguments*

a.     Defendants' brief in support of the motion

The defendants argue that "the Complaint fails to allege any facts to support a strong inference that either Messrs. Jagdfeld or Ragen had actual knowledge of specific information that allegedly contradicted the Statements at the time they were made." Dkt. No. 31 at 31 (citing <u>W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.</u>, 495 F. Supp. 3d 622, 667 (N.D. Ill. 2020)). The defendants state that

> Plaintiff's only attempts to plead actual knowledge specific to the Individual Defendants consists of (a) confidential witness allegations (¶¶ 40-52); (b) allegations that "Generac" did not have information to support statements about inventory levels (¶¶ 75-76); and (c) suggestions that the Individual Defendants were monitoring company data (¶ 69), production levels were increasing prior to the

18

class period (¶ 70), and close rates were "out of line" with consultations (¶ 71).

Id. The defendants assert that "[t]he only confidential witness that even mentions the Individual Defendants (CW3) merely speculates about what 'would have' been discussed with Messrs. Jagdfeld or Ragen by others during meetings that CW3 did not attend." Id. (citing Dkt. No. 25 at ¶52). The defendants observe that "[t]he Complaint's 'additional scienter allegations' are that 'Generac' purportedly lacked inventory and production data sufficient to support its predictions," before asserting that "[t]hose allegations do not even attempt to describe the information on which Messrs. Jagdfeld or Ragen relied, or any facts to show that such information was so insufficient as to give rise to a securities fraud claim." Id. at 31-32 (citing Dkt. No. 25 at ¶¶75-76). The defendants contend that "the vague claim that [Jagdfeld and/or Ragen] lacked sufficient data is directly contradicted by the Complaint's other allegations that the Individual Defendants closely monitored data and knew field inventory with 'a high degree of accuracy.'" Id. at 32 (citing Dkt. No. 25 at ¶69).

The defendants argue that motive-and-opportunity allegations are insufficient to plead scienter. Id. at 32. They contend that "the Complaint's boilerplate allegations of motive and opportunity do not plead scienter because they are 'too generic,' as 'a similar assertion could be made about every firm in the world.'" Id. (quoting Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc., 679 F.3d 952, 956 (7th Cir. 2012)). The defendants assert that "[a]llegations, like those in the Complaint that the Individual Defendants 'were motivated to increase the Company's stock price' (¶ 80), are

19

not enough." Id. at 32-33 (citing Plumbers & Pipefitters Local Union 719, 679 F.3d at 956; W. Palm Beach Firefighters' Pension Fund, 495 F. Supp. 3d at 665). The defendants state that "[s]peculation that the Individual Defendants might increase their compensation if they drive the stock price up and deliver on the Company's key initiatives (¶¶ 81-82) are similarly insufficient." Id. at 33 (citing Plumbers & Pipefitters Local Union 719, 679 F.3d at 956).

The defendants argue that "[t]he Complaint's allegations concerning the Individual Defendants' roles in the Company and access to 'confidential and proprietary information' (¶ 86) fare no better." Id. The defendants contend that "[s]cienter pleading cannot rest on a suggestion that defendants simply 'must have been aware' of the misstatement based on their positions." Id. at 33-34 (citing Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp, Case No. 20 C 2176, 2022 WL 1642221, at *22 (N.D. Ill. May 24, 2022)). They assert that, "[l]ikewise, mere access to internal reports and data monitoring systems (e.g., ¶¶ 69, 86) is insufficient to raise a strong inference of scienter." Id. at 34 (citing Pierrelouis v. Gogo, Inc., 414 F. Supp. 3d 1164, 1174 (N.D. Ill. 2019)).

Next, the defendants argue that "[i]nsider stock sales are insufficient to plead scienter." Id. The defendants maintain that "[t]he Complaint does not allege that Mr. Ragen sold any Generac shares during the class period[;] [t]his *negates* any inference that Mr. Ragen acted with scienter." Id (citing In re Piedmont Lithium Inc. Sec. Litig., 712 F. Supp. 3d 301, 311 (E.D.N.Y. 2024) (emphasis in the original)). As for Jagdfeld, the defendants assert that

20

"'because executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter.'" <u>Id.</u> at 35 (quoting <u>Pugh</u>, 521 F.3d at 695). The defendants state that "the Complaint must provide context sufficient to demonstrate that Mr. Jagdfeld's stock sales were unusual or suspicious." <u>Id.</u> (citing <u>Pension Tr. Fund for Operating Eng'rs</u>, 266 F. Supp. 3d at 1168). They observe that the complaint says nothing about the context or timing of Jagdfeld's sales, which the defendants say "is unsurprising, given that the Complaint groups three sales by Mr. Jagdfeld together in a single allegation (see ¶ 82), but fails to advise the Court that each sale was: (a) executed pursuant to a Rule 10b5-1 plan; (b) consistent in timing and amount with Mr. Jagdfeld's prior sales history; and (c) constituted a minute percentage of his total holdings." <u>Id.</u> at 35-36.

Finally, the defendants argue that "[t]he Complaint fails to plead an inference of scienter that is sufficiently cogent." <u>Id.</u> at 36. They contend that, "[i]n the Seventh Circuit, an inference of scienter is not sufficiently cogent where, like here, it is 'only one of many possible explanations.'" <u>Id.</u> (quoting (citing <u>Pierrelouis</u>, 414 F. Supp. 3d at 1174). The defendants observe that they "need not propose alternative reasons that their predictions ultimately missed the mark, as the Complaint already does so." <u>Id.</u> The defendants then assert that

> [t]he Complaint acknowledges that HSB sales in the second quarter of 2023 were "impeded by adverse macroeconomic headwinds" and "worsening macroeconomic conditions." ¶¶ 59, 67. This explanation for lower HSB sales and Generac's guidance adjustment is consistent with the explanation in Generac's public disclosures— which the Complaint does not allege was inaccurate. See ¶¶ 53-56

21

(Generac disclosing HSB sales were lower than expected "as a result of a softer consumer spending environment"). It is also consistent with the contemporaneous investment analyst observation the Complaint acknowledges. See ¶ 57 (analyst lowered guidance due to "slower-than-expected consumer trends"). Not only are these facts a far more compelling indicator of innocent conduct than any nefarious speculation the Complaint advances, they reflect the reality.

Id. at 36-37.

####    b.    The plaintiff's opposition brief

The plaintiff responds that the "Defendants 'knew or had access to information suggesting that their public statements were materially inaccurate.'" Dkt. No. 35 at 27-28 (quoting Flynn v. Exelon Corp., No. 19 C 8209, 2021 WL 1561712, at *10 (N.D. Ill. Apr. 21, 2021)). He contends that "the fact that Defendants made the false and misleading statements [he identifies] itself supports an inference of scienter." Id. at 28 (citing Jones v. Corus Bankshares, Inc., 701 F. Supp. 2d 1014, 1022 (N.D. Ill. 2010)). The plaintiff argues that "Defendants admitted that they were highly focused on monitoring the customer sale cycle and inventory levels." Id. at 29 (citing Dkt. No. 25 at ¶¶69-74). The plaintiff claims that "former employees confirmed that, through receipt of regular reports, notifications from channel partners, and even hands-on budget meetings, Defendants were kept apprised of Generac's inventory normalization process and deteriorating macroeconomic conditions further impacting the destocking process and sales prospects." Id. The plaintiff reiterates his allegation that "Jagdfeld and Ragen controlled all aspects of Generac, had access to proprietary company information, controlled its public statements, approved and reported its misleading financial and operational

22

results, and made numerous public statements regarding the Company's production rates, inventory levels, consumer demand, and sales prospects both before and during the Class Period." Id. at 33 (citing Dkt. No. 25 at ¶¶29, 31, 34-35, 60-64, 83-86). He asserts that "Defendants' unprompted statements and responses to questions raised by analysts about Generac's inventory normalization process and factors influencing HSB sales, further supports an inference that they knowingly concealed the adverse information." Id. at 34 (citing Dkt. No. 25 at ¶¶29, 35, 54-56, 62-64). The plaintiff argues that "Defendants cannot now claim they were ignorant to the varied and significant deficiencies plaguing Generac's inventory and sales, especially where corporate management was aware of the overproduction, idling-high inventory levels, and declining customer orders or shipments." Id. (citing Jones, 701 F. Supp. 2d at 1028).

The plaintiff asserts that motive allegations bolster the inference of scienter. Id. at 35. The plaintiff alleges that "Jagdfeld and Ragen each stood to gain so long as the alleged adverse information was concealed because their executive compensation was tied directly to Generac's stock price." Id. (citing Dkt. No. 25 at ¶¶2, 80). The plaintiff claims that "Defendants' May 3 representations touting Generac's strong consumer demand, had an outsized effect on the Company's stock price, leading investors to purchase Generac stock at elevated levels relative to its competitors." Id. (citing Dkt. No. 25 at ¶¶38, 77-79).

On August 25, 2025—after the February 4, 2025 oral argument on the motion—the plaintiff filed a supplement to his brief. Dkt. No. 43. He attached two cases: <u>Hawkins v. Danaher Corp., *et al.*</u>, Case No. 23-02055, 2025 WL 2216149 (D.D.C. Aug. 4, 2025) and <u>Indiana Pub. Ret. Sys. v. Rivian Auto., Inc.</u>, Case No. 24-cv-4566, 2025 WL 2426714 (C.D. Cal. Aug. 20, 2025). <u>Id.</u> The plaintiff identifies the arguments in his opposition brief to which he believes these cases are relevant. <u>Id.</u>

c.     The defendants' reply brief

The defendants reply that "[t]he Complaint not only fails to plead with particularity—but is glaringly devoid of *any*—facts to show that Defendants had actual knowledge of information that allegedly contradicted their Statements at the time they were made." Dkt. No. 37 at 16 (emphasis in original). The defendants reiterate that "[n]one of the confidential witnesses had first-hand knowledge that the supposedly omitted information ***was known by Messrs. Jagdfeld or Ragen*** at the time of the Statements," and they assert that "the Opposition effectively concedes this point." <u>Id.</u> (emphasis in original) (citing Dkt. No. 35 at 32). The defendants contend that, "[b]y requiring plaintiffs to plead 'significant detail' and provide 'precision and some measure of substantiation' for their fraud allegations, the PSLRA's stringent requirements are intended to preclude claims based on unsupported inferences." <u>Id.</u> (quoting <u>Hunter v. Elanco Animal Health Inc.</u>, Case No. 20-CV-01460, 2022 WL 3445173, at *18–19 (S.D. Ind. Aug. 17, 2022)). They state that because the complaint does not allege actual knowledge,

24

> the Opposition attempts to suggest knowledge based on a host of alternative theories that all require major assumptions and inferential leaps: (a) Defendants "should have known" because the Statements related to a "core operation;" (b) Defendants *generally* received *unspecified* updates and "had access to" *unspecified* "company information;" and (c) Defendants responded to analyst questions "about Generac's inventory normalization process and factors influencing HSB sales."

Id. at 18 (emphasis in original).

The defendants provide three reasons why the court should reject the plaintiff's scienter arguments: (1) "Plaintiff's 'core operations' argument relies on a bald assertion that 'inventory problems plaguing HSB sales were pervasive' . . . but that establishes nothing;" (2) "allegations about information to which Defendants purportedly 'had access' . . . are wholly devoid of any *specific information* that would have alerted Defendants to an alleged misstatement, or *when* such information would have been available;" and (3) "the Opposition's argument that Messrs. Jadgfeld and Ragen made unprompted statements and responded to analysts in a way that supports an inference of scienter is misplaced. Only three of the twelve Statements were made in response to analyst questions (see Appx. 1, Nos. 10-12), and all of those were consistent with the previously-stated prepared remarks." Id. at 18-20 (emphasis in original).

> 2.  *Analysis*

"Scienter pleadings in securities fraud class actions must satisfy a heightened standard of plausibility." Pension Tr. Fund for Operating Eng'rs, 895 F.3d at 936. Through the PSLRA, Congress requires that plaintiffs "state

*with particularity* facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A) (emphasis added); see also Tellabs, 551 U.S. at 323 (holding that "Congress did not merely require plaintiffs to provide a factual basis for [their] scienter allegations[;]" rather, "Congress required plaintiffs to plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference"). For a case under §10(b), that state of mind is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." Higginbotham, 495 F.3d at 756.

The Supreme Court has instructed lower courts that a complaint gives rise to a strong inference of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. The allegations in the complaint "are accepted as true and taken collectively." Id. at 326. The court must consider the relative probability of whether, taken as a whole, the alleged false statements were "the result of merely careless mistakes at the management level based on false information fed it from below" or reflect "an intent to deceive or a reckless indifference to whether the statements were misleading." Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 709 (7th Cir. 2008). "If the latter inference is not at least as compelling as the former, dismissal is appropriate." Pension Tr. Fund for Operating Eng'rs, 895 F.3d at 937. The Seventh Circuit has "rejected the 'group pleading doctrine,' a judicial presumption that statements in group-published documents are

26

attributable to officers who have daily involvement in company operations; thus, the plaintiffs must create a strong inference of scienter with respect to each individual defendant." Pugh, 521 F.3d at 693.

The amended complaint fails to plead sufficient facts to support a strong inference of scienter. The complaint does not allege that Jagdfeld or Ragen had actual knowledge of specific information that contradicted the allegedly false statements at the time they were made. None of the confidential witnesses observed Jagdfeld or Ragen receive any report or information that contradicted the May 3rd statements. See Dkt. No. 25 at ¶¶39-52. At most, CW3 speculates about what "would have" been discussed with Jagdfeld or Ragen by others during meetings that CW3 did not attend. See Dkt. No. 25 at ¶52. Although CW3 asserted that "there was 'no question' that Defendant Jagdfeld knew about the excess inventory by the end of 2022[,]" this is at best deductive reasoning and at worst speculation; it does not confirm that Jagdfeld or Ragen had actual knowledge. See Hunter, 2022 WL 3445173, at *21 ("These allegations reflect the epitome of the 'must have known' allegations prohibited as actionable by the PSLRA." (internal quotation marks and citation omitted)); Boca Raton Firefighters' and Police Pension Fund v. DeVry Inc., No. 10 C 7031, 2012 WL 1030474, at *8 (N.D. Ill. Mar. 27, 2012) (CW hypotheticals, such as what a defendant "would" do, are not strong support).

Absent direct allegations that Jagdfeld or Ragen received information that contradicted the defendants' May 3rd statements, what remains are the amended complaint's description of circumstantial evidence which the plaintiff

27

asserts shows that Jagdfeld or Ragen acted with scienter. But these circumstances do not reveal "an intent to deceive or a reckless indifference to whether the statements were misleading." See Makor Issues & Rights, 513 F.3d at 709.

The plaintiff's attempt to infer scienter based on the alleged misstatements' relation to a "core operation" is not persuasive. See Dkt. No. 35 at 28. Under the "core operations" doctrine, "officers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance." In re Supreme Indus., Inc. Sec. Litig., Case No. 17CV143, 2018 WL 2364931, at *8 (N.D. Ind. May 23, 2018) "'Core operations "include matters critical to the long[-]term viability of the company and events affecting a significant source of income,"' but '[t]he doctrine "typically applies only where the operation in question constitute[s] nearly all of a company's business."'" In re Baxter Int'l Inc. Sec. Litig., No. 19 C 7786, 2021 WL 100457, at *13 (N.D. Ill. Jan. 12, 2021). "Although the 'core operations' inference generally will not establish a strong inference of scienter by itself, it 'can be one relevant part of a complaint' supporting that inference." Id. (quoting S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784–85 (9th Cir. 2008)). That said, the plaintiff still must allege actual knowledge of the problem by the defendant and cannot rely on allegations of "some second-hand belief that such knowledge existed." Makor Issues & Rights, 513 F.3d at 711 (concluding that in the absence of any allegation that a defendant had actual awareness of material information or any allegation that

28

the confidential witness communicated with the defendant, a strong inference of scienter could not be established based on the defendant's implied knowledge). Although the court accepts that the HSB generators are a central component of the defendants' business, this alone does not create "an intent to deceive or a reckless indifference to whether the statements were misleading" when there are significant factors that could equally point to the alleged misstatements being "the result of merely careless mistakes at the management level based on false information fed it from below." Id. at 709. For example, the amended complaint acknowledges (multiple times) that the defendants disclosed these inventory challenges to shareholders before they made the allegedly misleading May 3rd statements, see dkt. no. 25 at ¶¶31, 34, so it is possible that Jagdfeld and Ragen did not receive accurate or updated information regarding Generac's inventory problems between the dates of those prior disclosures and the May 3rd statements. See Pierrelouis, 414 F. Supp. 3d at 1174 (merely alleging that defendant could and did track certain metrics and had access to certain data, without other factual details, does not provide particularized information about when data revealed problems). The amended complaint needed to allege more than simply asserting that the HSB generator inventory level was tied to a "core operation."

To supplement the "core operation" argument, the plaintiff emphasizes Jagdfeld and Ragen's control over Generac, as well as their profit motivation, but neither of these facts are sufficient to provide a strong inference of scienter. The Seventh Circuit has held that allegations that defendants "had an incentive

29

to make [their company] look good in order to keep their jobs, improve their bonuses, and increase the value of their stock options" are "too generic to satisfy" the scienter requirement. Plumbers & Pipefitters Loc. Union 719, 679 F.3d at 956. The court reasoned that "[a] similar assertion could be made about every firm in the world, but the fact that managers benefit from higher stock prices does not imply that any particular manager committed fraud." Id. The Seventh Circuit continued: "Quite the contrary. Managers usually do best when a firm has long-term success." Id. The Seventh Circuit opined that "[t]hose who boost prices fraudulently for six months or so . . . and then see market capitalization decline, may find themselves on the street, and their stock options won't vest." Id. The plaintiff's amended complaint makes the same type of "generic" allegations regarding control and motivation that the Seventh Circuit has rejected.

When the court weighs the plaintiff's allegations regarding Jagdfeld and Ragen's state of mind, the court finds it just as likely that the alleged false statements were "the result of merely careless mistakes at the management level based on false information fed it from below" as that the alleged false statements were a reflection of "an intent to deceive or a reckless indifference to whether the statements were misleading." Makor Issues & Rights, 513 F.3d at 709. The amended complaint does not satisfy the "heightened standard of plausibility" required to plead scienter under the PSLRA. Pension Tr. Fund for Operating Eng'rs, 895 F.3d at 936.

Because the amended complaint does not allege scienter with the required particularity, the court must grant the defendants' motion to dismiss. See Pugh, 521 F.3d at 693 ("The Supreme Court has directed us to dismiss the complaint unless 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" (quoting Tellabs, Inc., 551 U.S. 308).

C.    Falsity

The defendants also argue that the amended complaint fails to adequately plead falsity. Dkt. No. 31 at 16-30. The defendants observe that the plaintiff challenges twelve specific statements, which the defendants divide into two categories: "(a) four statements that discussed historical information about field inventory levels (¶¶ 60, 62, 64); and (b) eight statements that were predictions about expected future field inventory levels and/or future sales growth (¶¶ 60, 62-64)." Id. at 16. The defendants contend that (1) "[t]he Complaint's allegations do not plead how any of the Statements were false or misleading;" (2) "[a]ll of the twelve Statements were non-actionable opinions;" (3) "[e]ight of the twelve Statements were forward-looking statements, and are protected by the PSLRA safe harbor;" and (4) "[a]ll of the twelve Statements were non-actionable puffery." Id. at 17, 21, 25, 29.

Because the court has determined that the amended complaint does not satisfy the PSLRA's scienter requirement, the court need not reach the defendants arguments regarding falsity. See Wade v. Wellpoint, Inc., 740 F. Supp. 2d 994, 1012 n. 14 (S.D. Ind. 2010) (electing not to thoroughly address

31

defendants' falsity arguments after determining "Plaintiff has failed to create a strong inference that any Defendant was reckless as to the falsity of the alleged misstatements").

## IV. Conclusion

The court **GRANTS** the defendants' motion to consider documents under the incorporation-by-reference doctrine or by judicial notice. Dkt. No. 33.

The court **GRANTS** the defendants' motion to dismiss the amended complaint. Dkt. No. 30.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 3rd day of February, 2026.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**